1  LONNIE D. GIAMELA, SBN 228435
   lgiamela@fisherphillips.com
2  SEAN F. DALEY, SBN 272493
   sdaley@fisherphillips.com
3  FISHER & PHILLIPS LLP
   444 South Flower Street, Suite 1500
4  Los Angeles, California 90071
   Telephone: (213) 330-4500
5  Facsimile: (213) 330-4501

6  Attorneys for Defendant
   RED ROBIN INTERNATIONAL, INC.
7

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11 MARCIANO TOPETE,                    Case No:  8:17-cv-01721 AG (JDEx)
                                       *[Originally Orange County Superior
12              Plaintiff,             Court Case No.: 30-2017-00930423-CU-
                                       OE-CJC]*
13      v.

14 RED ROBIN INTERNATIONAL,            **DEFENDANT RED ROBIN
   INC., a Nevada Corporation, doing   INTERNATIONAL, INC.'S
15 business as RED ROBIN BURGER        APPENDIX OF EXHIBITS IN
   AND SPIRITS EMPORIUMS, and          SUPPORT OF MOTION FOR
16 DOES 1 through 20, inclusive,       PARTIAL SUMMARY JUDGMENT**

17              Defendants.            *[Filed Concurrently with Notice of
                                       Motion and Motion, Memorandum of
18                                     Points and Authorities in support thereof,
                                       Separate Statement of Uncontroverted
19                                     Facts and Conclusions of Law,
                                       Declaration of Sean F. Daley,
20                                     [Proposed] Order and [Proposed]
                                       Judgment]*
21

22                                     Date:        August 20, 2018
                                       Time:        10:00 a.m.
23                                     Location:    Courtroom 10D
                                                    411 West Fourth Street
24                                                  Santa Ana, California

25

26                                     Complaint Filed:  July 7, 2017
                                       FAC Filed:        July 27, 2017
27                                     Trial Date:       October 2, 2018

28

Defendant RED ROBIN INTERNATIONAL, INC. ("Red Robin") hereby submits the following Appendix of Evidence in support of its Motion for Partial Summary Judgment.

## TABLE OF CONTENTS

- Declaration of Sean F. Daley

| EXHIBIT | EVIDENCE |
|---|---|
| A | Relevant excerpts and exhibits from the certified transcript of the first volume of Plaintiff's deposition testimony from April 30, 2018. |
| B | Relevant excerpts and exhibits from the certified transcript of the second volume of Plaintiff's deposition testimony from June 22, 2018. |
| C | Relevant excerpts from the certified transcript of Rebecca Bailey's deposition testimony from May 2, 2018. |
| D | Relevant excerpts from the certified transcript of Adin Philleo's deposition testimony from May 2, 2018. |
| E | Relevant excerpts and exhibits from the certified transcript of Karin Davie's deposition testimony from May 4, 2018. |

Dated:  July 23, 2018

Respectfully submitted,

FISHER & PHILLIPS LLP


By: */s/ Sean F. Daley*
LONNIE D. GIAMELA
SEAN F. DALEY
Attorneys for Defendant
RED ROBIN INTERNATIONAL, INC.

1

# EXHIBIT B

EXHIBIT B

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    MARCIANO TOPETE,                    )

5                   Plaintiff,           )

6             vs.                        ) Case No. 8:17-cv-01721

7    RED ROBIN INTERNATIONAL, INC.,      )        AG (JDEx)

8    a Nevada corporation, doing         )

9    business as RED ROBIN BURGER        )

10   AND SPIRITS EMPORIUMS; and          )

11   DOES 1 through 20, inclusive,       )

12                   Defendants.         )

13   _____)

14

15

16               CONTINUED DEPOSITION OF

17            MARCIANO TOPETE, VOLUME II

18              Los Angeles, California

19                  June 22, 2018

20

21   Reported by:

22   HEATHER HOBAN, CSR No. 10568

23   Job No. 2920799

24

25

                                        Page 195

```
 1            LOS ANGELES, CALIFORNIA; FRIDAY, JUNE 22, 2018

 2                          1:09 P.M.

 3

 4                      MARCIANO TOPETE,

 5               having been first duly sworn, was

 6               examined and testified as follows:

 7

 8                       EXAMINATION

 9    BY MR. GIAMELA:

10        Q.    Mr. Topete, good afternoon.  My name is Lonnie

11    Giamela.  I'm one of the other attorneys that represent

12    Red Robin in this case.  I want to go over with you, as

13    we start, some of the instructions that Mr. Daley, my

14    colleague, went over with you during your first

15    deposition.

16               You had your deposition in this case taken

17    before.  Do you recall that, sir?

18        A.    Yes.

19        Q.    Okay.  The most important rule for the time

20    that we're together today, rule number one, most

21    important one, is that the most important person in this

22    room is neither you, nor me, nor Mr. Jackel.  It's the

23    gentlelady to your left.  We want to keep her happy the

24    whole time.  And as Mr. Daley said, likely gave you the

25    instruction at your first deposition, we don't want to
```

Page 199

1        Q.    And did Juan tell you this first, or did Jose
2   tell you this first?
3        A.    Juan.
4        Q.    Okay.  And how soon after Juan telling you did
5   Jose tell you?
6        A.    I don't recall exactly the time but right
7   after.
8        Q.    Would you say within a couple days?
9        A.    Or a week.
10       Q.    And what did Jose tell you?
11       A.    Same thing, that I was getting fired because
12   they heard I was suing Red Robin.
13       Q.    Now, just to be clear, at that time -- okay.
14   Let me take it a step back.
15             At any time during your employment at the
16   company, did you file any complaints with any
17   governmental agency regarding any aspect of your
18   employment with Red Robin?
19       A.    Repeat that again.
20             MR. GIAMELA:  Madam Court Reporter, can you
21   read back the question, please.
22             (Record read.)
23             THE WITNESS:  No, no.
24   BY MR. GIAMELA:
25       Q.    At any time during your employment, did you

                                              Page 204

1   have any communication, written or verbal, with any

2   governmental agency regarding your employment at Red

3   Robin?

4        MR. JACKEL:  You know, I should make another

5   belated objection again.  When you say "any government

6   agency," that's very broad.  I don't know that he

7   understands what sort of agencies would be covered.

8        MR. GIAMELA:  Okay.  You can just object and

9   say it's vague, and he can answer.  No speaking

10  objections during the deposition.

11       Q.   You can go ahead and answer.

12       A.   Not that I remember.

13       Q.   Did you file any complaints with anyone in the

14  company's human resources department during your

15  employment relating to any aspect of your employment?

16       A.   Yes, I did.

17       Q.   And how many complaints did you file?

18       A.   Through my Red Robin employment?

19       Q.   How many complaints during your employment did

20  you file with the company's human resources department?

21       A.   Two.

22       Q.   When was the first one?

23       A.   I don't recall the time exactly.

24       Q.   Were you working in the Irvine restaurant at

25  the time?

Hahn & Bowersock, A Veritext Company
800.660.3187

```
1        A.    No.
2        Q.    And do you know generally what the complaint
3   was about that you raised an issue about?
4        A.    Which one?
5        Q.    The first one that you're talking about.
6        A.    It was about harassing.
7        Q.    And who did you claim harassed you?
8        A.    Say that again.
9        Q.    You indicated you complained, you personally
10  complained, and you said you were being harassed.  Who
11  did you complain was harassing you?
12       A.    The general manager.
13       Q.    And who was the general manager that you
14  complained about?
15       A.    Joanne.
16       Q.    And do you recall who in human resources you
17  spoke with?
18       A.    No.
19       Q.    Do you have any of the communications you
20  exchanged with human resources?
21       A.    No.
22       Q.    Do you have any documents or information -- any
23  documents relating to your complaint against Joanne?
24       A.    No.
25       Q.    And do you know how that was resolved?
```

Page 206

1       A.    I was on medical leave.

2       Q.    Okay.  And what happened after you went on

3   medical leave?

4       A.    I went back to work.

5       Q.    Did they meet with you -- did someone in human

6   resources meet with you regarding this complaint?

7       A.    No.

8       Q.    Do you have any evidence to show that you

9   actually made this complaint, meaning do you have

10  documents, witnesses, anything that would support your

11  allegation that you made a complaint against Joanne?

12      A.    No.

13      Q.    And as you sit here today, can you recall the

14  name of any individual with whom you spoke with in human

15  resources to complain?

16      A.    No.

17      Q.    Do you recall what number -- did you do it in

18  writing or over the telephone?

19      A.    Over the telephone.

20      Q.    And do you recall what number you called?

21      A.    No.

22      Q.    Do you know how you found out what number to

23  call?

24      A.    I called the 800 and asked for human resources.

25      Q.    Was the second complaint you filed during your

Page 207

1    time in Irvine?  You said you filed two complaints to

2    human resources during your employment.  The first was

3    prior to you going to Irvine.  Was the second while you

4    were in Irvine, or was it also prior to Irvine?

5         A.    Irvine.

6         Q.    And what was the second complaint to human

7    resources about?

8         A.    It was a hostile environment and stress and

9    anxiety.

10        Q.    And who did you make that complaint to in human

11   resources?

12        A.    The 800 number.

13        Q.    Do you recall the person's name?

14        A.    No.

15        Q.    Did they call you back?

16        A.    Yes.

17        Q.    And was the matter investigated?

18        A.    Yes.

19        Q.    And do you recall getting a letter regarding

20   the findings of the investigation?

21        A.    No, that was over the phone.

22        Q.    And do you recall who you spoke with, the name

23   of the person, over the phone?

24        A.    No.

25        Q.    And what did they tell you?

Page 208

```
1          A.    That they did an investigation and they found
2    out that that was -- they were taking actions, and they
3    removed the person from the restaurant.
4          Q.    And who was the person?
5          A.    Becky.
6          Q.    Pardon me?
7          A.    Becky.
8          Q.    And do you know what Becky's last name was?
9          A.    No, I don't remember her last name.
10         Q.    And what position did Becky hold?
11         A.    Regional, corporate.
12         Q.    And what did you complain Becky was doing
13   that -- when you say hostile work environment, do you
14   mean like sexually towards you, or did you believe that
15   it was just hostile and that she was rude to you?
16         A.    Hostile and threats, things --
17         Q.    Explain to me what you mean by that.
18         A.    That she sat with me and tell me things like
19   she was going to bring somebody that make less money and
20   do the same work.  I was a very high paid manager, that
21   I have to work more.
22         Q.    Anything else?
23         A.    She just said that she was very disappointed
24   with me.
25         Q.    Anything else?
```

Page 209

| | | |
|---|---|---|
| 1 | A. | I don't recall everything. |
| 2 | Q. | During your time as kitchen manager, |

3  Mr. Topete, at the Irvine restaurant, what did you do

4  differently that cooks and bussers did not do?  What

5  duties and responsibilities did you have that the cooks

6  and bussers did not have?

| | | |
|---|---|---|
| 7 | A. | Count money. |
| 8 | Q. | Anything else? |
| 9 | A. | Open the restaurant. |
| 10 | Q. | Anything else? |
| 11 | A. | No. |
| 12 | Q. | Are you aware of how much per hour the cooks |

13  made?

| | | |
|---|---|---|
| 14 | A. | Not on top of my head. |
| 15 | Q. | Do you have an estimate?  I mean, did they make |

16  $50 an hour, closer to minimum wage?  What was your

17  understanding at the time?

18      A.   It varies between 12 and 15.

19      Q.   And was it your understanding that the company

20  was paying you $70,000 and the cooks 12 to $15 an hour

21  just for you to count money and open the restaurant?

22      A.   Say that again.  I'm sorry.

23      Q.   Well, you said the only two things you did that

24  the cooks and bussers didn't do was count money and open

25  the restaurant.  They paid the cooks 12 to $15 an hour

Page 210

```
 1    and paid you $70,000 a year.
 2        A.   Yes.
 3        Q.   And what I'm trying to get at is, do you have
 4    any understanding as to why the company would pay you
 5    $70,000, much higher than 12 to $15 an hour, to count
 6    money and open a restaurant?
 7             MR. JACKEL:  I'm going to object as being
 8    argumentative and asking to speculate.
 9    BY MR. GIAMELA:
10        Q.   I'm asking you, do you have any knowledge why
11    they would pay you $70,000 just to do these two tasks
12    different than the cooks and bussers and just not pay
13    you the same?
14        A.   No.
15        Q.   Is there anything other than counting money and
16    opening the restaurant that you had responsibility for
17    that the cooks and the bussers didn't have
18    responsibility for or weren't one of your duties?
19        A.   You mean all the cooks or certain cooks?
20        Q.   All of the cooks.  What did you do different
21    that the cooks and the bussers did not do, something
22    that was unique to your position?
23        A.   I mean, go to meetings.
24        Q.   Anything else?
25        A.   Certain cooks knew -- doing a lot of things the
```

Page 211

```
 1    11:00, 12:00, or shortly thereafter; correct?

 2        A.    Correct.

 3        Q.    So from 7 o'clock to 11 o'clock, were you

 4    always the highest ranking person there unless another

 5    manager showed up?

 6        A.    Yes.

 7        Q.    Was there any need -- was there ever a time

 8    where you served a customer food or prepared food for a

 9    customer prior to the restaurant opening?

10        A.    No.

11        Q.    Would there have ever been a need to wash

12    dishes before the restaurant opened?

13        A.    Absolutely.

14        Q.    And why?

15        A.    Because there is a lot of pans and pots being

16    used and containers that need to be washed.

17        Q.    I apologize.  Plates and silverware?

18        A.    No.

19        Q.    Just to be clear, that's because they cleaned

20    them the night before and the customers haven't eaten a

21    meal yet; correct?

22        A.    Correct.

23        Q.    And prior to starting actually preparing or

24    cooking food in the back of the house, in the kitchen,

25    was there a need to wash pots and pans?
```

Page 221

1      A.   Servers.

2      Q.   Did you ever personally witness Nicole comp a

3   meal to someone without going to a manager?

4      A.   No.

5      Q.   And did you ever witness Sherry do that without

6   going to a manager?

7      A.   No.

8      Q.   So what leads you to believe that they had the

9   ability to do that without going to a manager?

10      A.   Because they talk.  They say Adin -- it's okay

11   for previous managers.  That was okay.  Like how I trust

12   Jose to do line check, they trust some of the house

13   employees to do those comps.

14      Q.   On a weekly basis, you attended manager

15   meetings at the restaurant; correct?  On Mondays?

16      A.   Yes.

17      Q.   And not every week, but there were regular

18   regional manager meetings as well too; correct?

19      A.   Say it again, the regional.

20      Q.   Regional, where you were on the phone call with

21   managers from other stores; is that correct?

22      A.   Correct.

23      Q.   During these meetings, were there any

24   nonmanagers on these phone calls or at these meetings?

25      A.   No.

Page 231

```
 1    and worked between 50 and 55 hours a week; correct?
 2         A.   Correct.
 3         Q.   Other than that, you can't provide me any more
 4    detail as to how much you worked in a given week, day,
 5    or month, other than "When I was on leave, I didn't
 6    work," and "When I was on vacation in Mexico, I didn't
 7    work"; correct?
 8         A.   Correct.
 9         Q.   And have you ever seen any documents that would
10    be able to tell you when you started, when you finished,
11    or how long you worked in a given day?
12         A.   No.
13         Q.   Did you ever make any complaints during your
14    employment that you were not getting a meal period?
15         A.   No.
16         Q.   Did you ever make any complaints during your
17    employment that you were not getting a rest period?
18         A.   No.
19         Q.   Who was responsible for making sure that the
20    cooks got meal and rest periods?
21         A.   Managers.
22         Q.   You included; correct?
23         A.   Correct.
24         Q.   And did you make sure that the cooks got rest
25    periods?
```

Page 235

```
 1    and worked between 50 and 55 hours a week; correct?
 2         A.    Correct.
 3         Q.    Other than that, you can't provide me any more
 4    detail as to how much you worked in a given week, day,
 5    or month, other than "When I was on leave, I didn't
 6    work," and "When I was on vacation in Mexico, I didn't
 7    work"; correct?
 8         A.    Correct.
 9         Q.    And have you ever seen any documents that would
10    be able to tell you when you started, when you finished,
11    or how long you worked in a given day?
12         A.    No.
13         Q.    Did you ever make any complaints during your
14    employment that you were not getting a meal period?
15         A.    No.
16         Q.    Did you ever make any complaints during your
17    employment that you were not getting a rest period?
18         A.    No.
19         Q.    Who was responsible for making sure that the
20    cooks got meal and rest periods?
21         A.    Managers.
22         Q.    You included; correct?
23         A.    Correct.
24         Q.    And did you make sure that the cooks got rest
25    periods?
```

Hahn & Bowersock, A Veritext Company
800.660.3187

```
 1        A.    Yes, in a way, if they sign the waiver book and
 2   then --
 3        Q.    But the waiver book only pertains to meal
 4   periods.  I'm asking you about rest periods.  Did you
 5   make sure that your cooks got rest periods each day?
 6        A.    They work it out on their own.  When they had
 7   time, they just went.
 8        Q.    Did you do anything as the kitchen manager at
 9   Red Robin to make sure that the cooks were getting rest
10   periods?
11        A.    Yes.
12        Q.    And what did you do specifically?
13        A.    They signed -- they signed the book, and if
14   they waive it, then I didn't do anything.  If they
15   wanted to take a break, then I would say before the six
16   hours, go on break.
17        Q.    I want to be very clear.  That book only
18   pertains to meal periods.  I'm asking you about rest
19   periods, not meal periods.  With respect to rest
20   periods, did you do anything to make sure that your
21   cooks were taking rest periods?
22        A.    Yes.
23        Q.    And what did you do specifically?
24        A.    They asked me if they can go in the den.
25        Q.    And what did you tell them?
```

Hahn & Bowersock, A Veritext Company
800.660.3187

1      A.    If the rest room was allowed, yes, and other --

2   most of the times, I covered them because we didn't have

3   any other coverage.

4      Q.    So you would cover them while they were on

5   their rest period?

6      A.    Correct.

7      Q.    But from 7:00 in the morning until 11 o'clock,

8   when the restaurant opened, there were no customers in

9   the restaurant; correct?

10     A.    Correct.

11     Q.    And did you make sure that they got their rest

12  periods during the morning portion of their shifts?

13     A.    Not 'til after we got the rush.  They didn't

14  take their rest time before we opened.

15     Q.    Before you opened the restaurant?

16     A.    They didn't have rest time before they opened

17  the restaurant.

18     Q.    And why not?

19     A.    Because they don't ask.

20     Q.    Did you ever make sure and just go up to them

21  and say, "Hey, it's time for you to take a ten-minute

22  rest period"?

23     A.    No.

24     Q.    And why not?

25     A.    Because there is a post sign.  If the employee

Page 237

```
 1    Schedules change.
 2         Q.   And where does she work?
 3         A.   Fleming's.
 4         Q.   And if she had to work during the shift, who
 5    went and picked up Mackenzie to bring her to the
 6    restaurant?
 7         A.   Her, because her -- the school is close to her
 8    house.
 9         Q.   And did anyone else watch your children at
10    times when you and your wife were both working -- excuse
11    me -- you and your girlfriend were both working, or if
12    your girlfriend was working, they always came to the
13    restaurant?
14         A.   Not always.
15         Q.   Who would watch them in the alternative?
16         A.   Her mom.
17              MR. GIAMELA:   Let's go ahead and take a break.
18              (Recess taken.)
19    BY MR. GIAMELA:
20         Q.   Mr. Topete, when cooks, bussers, or
21    dishwashers, when it was slow, who made the decision as
22    to whether or not to send them home?
23         A.   A manager.
24         Q.   Including yourself?
25         A.   Correct.
```

Page 250

1      Q.   Was there any nonmanager who was involved in

2   that decision?  I presume it was only managers, but I

3   just wanted to double check and make sure.

4      A.   In the kitchen, if there was three cooks, they

5   rotate who left that day.

6      Q.   Correct, but whether one person got to leave or

7   not was the kitchen manager or the manager on duty's

8   decision; correct?

9      A.   Correct.

10      Q.   And if you were there -- let's say you were

11   there and there was a general manager and the

12   decision -- or restaurant manager, and it was slow and

13   someone from the kitchen had to be sent home.  Were you

14   the one that was making the decision of who was going to

15   be -- whether someone was going to be sent home, and

16   then the cooks would decide which one of the three would

17   go?

18      A.   Usually, any manager say who is leaving, either

19   general manager, other manager, or myself.

20      Q.   But the cooks couldn't make that decision by

21   themselves?  They had to get direction from a manager;

22   correct?

23      A.   Correct.

24      Q.   And when you made the decision, what factors

25   did you use in making the decision of whether or not

Hahn & Bowersock, A Veritext Company
800.660.3187

1    someone should go home or not?

2        A.    Based on how slow.

3        Q.    Okay.  Anything else?

4        A.    (No audible response.)

5        Q.    I apologize.  Anything else?

6        A.    Based on how slow it was.

7        Q.    Anything other than that?

8        A.    I don't recall at this moment.

9        Q.    Is there anything that would refresh your

10   recollection that you have at home that you could

11   reference?

12       A.    Well, there was the other factor that we have

13   to save labor for the company, so --

14       Q.    But included in the labor, when you're sending

15   someone home early, it's expected during the day that

16   they're going to work the whole day.  You're not making

17   them work longer than expected.  You're actually sending

18   them home earlier than expected; correct?

19       A.    Correct.

20       Q.    What reports regarding labor were provided to

21   you as the kitchen manager?

22       A.    Say that again.  I'm sorry.

23       Q.    What reports were provided to you as part of

24   your kitchen manager responsibilities?

25       A.    I'm not clear.  Reports for what?

Page 252

1        Q.    Were you given any documents showing labor

2    costs, labor efficiencies, how the restaurant was doing

3    financially, how the restaurant was doing from a

4    performance standpoint?

5        A.    Yeah, that was -- you could bring it up on the

6    computer.

7        Q.    Okay.  And what reports were those or

8    documents?

9        A.    Just labor analyses, labor --

10       Q.    And what would be the reason why you would want

11   to go look at those?

12       A.    To see if they were overused or underused.

13       Q.    The amount of labor that was expected to be

14   scheduled varied from day to day; correct?

15       A.    Correct.

16       Q.    And it varied from season to season; correct?

17       A.    Correct.

18       Q.    There were more employees scheduled for

19   different days of the week, specifically the weekend,

20   than on the weekdays; correct?

21       A.    Correct.

22       Q.    And there were more employees scheduled during

23   the summer season and the holiday season than the other

24   times of the year; correct?

25       A.    Correct, if we had it.

Hahn & Bowersock, A Veritext Company
800.660.3187

```
 1        Q.    Pardon me?

 2        A.    If we had the staff, yeah.

 3        Q.    What financials about the store were provided

 4   to you as kitchen manager?

 5        A.    Can you be more specific?

 6        Q.    Did you ever believe that there was a pressure

 7   of meeting financials at the company?

 8        A.    Yes.

 9        Q.    And what financials are you referring to?

10        A.    Labor.

11        Q.    Anything else?

12        A.    Food cost.

13        Q.    Anything else?

14        A.    That I was in charge?

15        Q.    That you were in charge of, yeah.

16        A.    Back of the house labor and food cost.

17        Q.    You indicated previously that there were cooks

18   that sometimes ordered the food, okay?  Did the cooks

19   get access to these labor analysis reports?  Did they

20   have access to them, to your knowledge?

21        A.    The general manager printed the reports and put

22   them on the wall, and then some of us employees can see

23   how we were doing.

24        Q.    Correct, but if the general manager didn't do

25   it, are you aware of any cook or nonmanager having
```

Page 254

1  Q. What are heating and cooling charts?

2  A. When you cook something and it has to cool down

3 for the proper Health Department cooling procedure.

4  Q. Who is ultimately responsible in the kitchen

5 for making sure that the kitchen is safe and sanitary

6 from a food preparation standpoint?

7  A. Everybody.

8  Q. But who is ultimately responsible?  Is that the

9 kitchen manager?

10  A. It's just a name, kitchen manager, but every

11 manager is in title of that.

12  Q. Okay.  But the manager on duty who is

13 overseeing the kitchen is the person ultimately

14 responsible for it; correct?

15  A. Correct.

16  Q. And when that was -- when you were working,

17 that was you; correct?

18  A. Correct.

19  Q. And as far as making sure that the employees

20 were using knives properly and being safe in the

21 preparation of food and presenting the food out, that

22 was the manager on duty overseeing the kitchen; correct?

23  A. Correct.

24  Q. And when it was you working, that was you;

25 correct?

Page 261

1       Q.    Because when you say every manager's

2   responsibility, you weren't responsible for anything

3   that was going on in the front of house; correct?

4       A.    Of course.

5       Q.    You were?

6       A.    If a manager was in the office doing something

7   and then I got a call for something, and then if I'm

8   cooking, I left the cooking for, you know, five minutes

9   and do something.

10      Q.    And what would that be?  What were you called

11  out for as the kitchen manager to come out when the

12  other manager was in the office or doing something?

13  Customer issue?

14      A.    Talk to the guests.  I would go back to the

15  back and then go back and --

16      Q.    Anything else?

17      A.    Not that I recall right now.

18      Q.    Did you have any other responsibilities for

19  overseeing the front of the house?

20      A.    When there was more than one manager, no.

21      Q.    How about when there wasn't?  Let's say a

22  restaurant manager is late to work, the person who comes

23  in at 11:00.  You're responsible for everything that

24  goes on at the restaurant from a managerial standpoint;

25  correct?

                                    Page 263

1       Q.    Because when you say every manager's

2    responsibility, you weren't responsible for anything

3    that was going on in the front of house; correct?

4       A.    Of course.

5       Q.    You were?

6       A.    If a manager was in the office doing something

7    and then I got a call for something, and then if I'm

8    cooking, I left the cooking for, you know, five minutes

9    and do something.

10      Q.    And what would that be?  What were you called

11   out for as the kitchen manager to come out when the

12   other manager was in the office or doing something?

13   Customer issue?

14      A.    Talk to the guests.  I would go back to the

15   back and then go back and --

16      Q.    Anything else?

17      A.    Not that I recall right now.

18      Q.    Did you have any other responsibilities for

19   overseeing the front of the house?

20      A.    When there was more than one manager, no.

21      Q.    How about when there wasn't?  Let's say a

22   restaurant manager is late to work, the person who comes

23   in at 11:00.  You're responsible for everything that

24   goes on at the restaurant from a managerial standpoint;

25   correct?

1        A.    Correct.

2        Q.    So if the rush comes in at lunch, there is a

3    problem with a guest, making sure the food is getting

4    out on time, that's all on you during that time period;

5    correct?  From a manager --

6        A.    Correct.

7        Q.    Would it be a correct statement, when you're

8    the only manager in the restaurant, that you're

9    responsible for the oversight of the entire restaurant

10   operations?

11       A.    Yes.

12       Q.    And when you're the only manager at the

13   restaurant, if an employee has an issue, a complaint, or

14   something to discuss, you're the manager, of course,

15   that they go to because you're the only one that's

16   there; correct?

17       A.    Correct.

18       Q.    And if you're the only manager on duty and

19   something happened that requires a managerial response,

20   a flood, a leak, something happens where you have to

21   call someone or get access, you were the one who was

22   responsible for that as the manager on duty; correct?

23       A.    Correct.

24       Q.    And if there was a customer issue and you're

25   the only manager on duty at the time, you're the one

Page 264

1    that would be responsible for handling that?

2        A.    Correct.

3        Q.    If there was -- when you got there in the

4    morning and the bartender comes and there is a short in

5    the drawer and you're the only manager on duty, are you

6    the one responsible for making sure everything gets

7    resolved prior to the restaurant opening?

8        A.    Yes.

9        Q.    Did you have keys to the actual restaurant?

10       A.    Yes.

11       Q.    Okay.  And how many different people had keys

12   to the restaurant, to your knowledge, that were not a

13   manager?

14       A.    Two.

15       Q.    Who else?

16       A.    Jorge and Jose.

17       Q.    And did they always work the open with you?

18       A.    Jorge was the day shift, Jose was the night

19   shift.

20       Q.    And when you say day shift, what time does

21   Jorge come in?

22       A.    Varies.  Sometimes 7:00 on Mondays to help me

23   with inventory, sometimes 8:00, sometimes 9:00 -- I mean

24   10:00.

25       Q.    You told me, though, by Monday at 7 o'clock,

Page 265

```
 1        Q.   And when did Adin approve it?

 2        A.   Since he got there.

 3        Q.   No --

 4        A.   It rolls from the time he got there.

 5        Q.   What date did you have a conversation where he

 6   said it's okay for Jose to do this -- or Jorge to do

 7   this?

 8        A.   There was not a conversation.  They just -- he

 9   came over, and it was already established from previous,

10   and he just rolling.

11        Q.   He never actually approved it himself?

12        A.   In a way, he did, because he saw that every

13   morning because Adin was there every morning.

14        Q.   But he never personally told you, "I approve

15   this happening"?

16        A.   He didn't disapprove.

17        Q.   I'm asking you did he ever tell you that he

18   approved it?

19        A.   No, because he came in and that was

20   established, and he just rolled with it.

21        Q.   Was it a managerial responsibility to do the

22   Steritech walk-through?

23        A.   Yes.

24        Q.   Was a manager always responsible for doing the

25   Steritech walk-through?
```

Page 267

```
1        A.   Yes.
2        Q.   And how often did the Steritech walk-through
3   happen?
4        A.   Was supposed to happen?
5        Q.   How often did it happen?
6        A.   It's supposed to be every night and every day,
7   every -- at the end of the shift and the beginning of
8   the shift.
9        Q.   And how often did it happen?
10       A.   Barely.
11       Q.   And you as the manager, as the opening manager,
12  were responsible for that every day; correct?
13       A.   Complete the one from the night before.
14       Q.   Correct.  Did you ever complain to anyone that
15  those Steritech walk-throughs were not being done?
16       A.   No.
17       Q.   And when they were done in the mornings, how
18  long did they take to do?
19       A.   Ten minutes.
20       Q.   And what was involved in a Steritech
21  walk-through?
22       A.   Safety and sanitation, paper towels, soap
23  dispensers.  I don't recall exactly what was in there.
24       Q.   Don't you have to, as part of the Steritech,
25  look at all the food that's been prepared already to
```

Page 268

```
 1        Q.    And who approved it at Santa Ana?

 2        A.    Mario.

 3        Q.    And what position did Mario have?

 4        A.    Kitchen manager.

 5        Q.    Any other restaurants you went to to allegedly

 6   take these pictures?

 7        A.    No.

 8        Q.    Just those two; correct?

 9        A.    Those two.

10        Q.    And is Homan, was he the kitchen manager at

11   that facility?

12        A.    Correct.

13        Q.    When you were employed at Elephant Bar, were

14   you paid on a salaried basis?

15        A.    Yes.

16        Q.    And did you ever complain to anyone there that

17   you believed you were entitled to overtime?

18        A.    No.

19        Q.    Did you ever sue Elephant Bar for unpaid wages?

20        A.    No.

21        Q.    And how were your duties at Elephant Bar

22   different than your duties at Red Robin, if at all?

23        A.    Same thing, save labor for the company and in

24   charge of food cost.

25        Q.    So why didn't you sue Elephant Bar?
```

Page 278

1      A.    Because Elephant Bar didn't threaten me, didn't

2    mistreat me.

3      Q.    Would it be a correct statement that the reason

4    you explored suing the company Red Robin for any reason

5    was based on how you believed you were terminated?

6      A.    Unfairly terminated, yeah.

7      Q.    At any time, did you visit any other restaurant

8    during your employment to see whether the restaurants

9    were as busy as you were at Irvine?

10     A.    No.

11     Q.    Did you ever ask colleagues at -- other kitchen

12   managers at other restaurants whether they were spending

13   as much time as you doing nonmanagerial duties?

14     A.    We talk in meetings and --

15     Q.    And who did you talk with?

16     A.    All the managers.  I -- you know, I talked to

17   Robert about it.  We just -- we just vent and we talk.

18   It's the same thing when I talked to Becky about why we

19   have to be employees, like our employees, because we

20   didn't have staff and then we have to save a lot of

21   labor for the company.

22     Q.    How often was it expected, not how often did

23   you do it, but did Red Robin ever give you guidance on

24   how often they expected you to do line checks?

25     A.    Say it again.

```
 1          Q.    Yeah.  I'm not asking you how often you did it.
 2     I'm asking you did they ever -- did they give you
 3     expectations as to how often they wanted you to do it?
 4          A.    To every manager, yes.
 5          Q.    And how often did they tell you they wanted
 6     line checks done?
 7          A.    Two times a day.
 8          Q.    Now, is it two times during a shift of yours or
 9     just two times a day throughout the whole time the
10     restaurant was open?
11          A.    It's A.M., opener, and P.M., manager comes in
12     and do his line check.
13          Q.    So it's one line check --
14          A.    Per shift.
15          Q.    -- per shift.  In the kitchen?
16          A.    Correct.
17          Q.    And did they ever give you any expectations or
18     estimations as to how long they expected it to take you?
19          A.    It varies between 45 minutes to an hour, yes.
20          Q.    When the restaurant first opens at 10:00 or
21     11 o'clock, who is responsible for expediting the food?
22          A.    If there is no expediter, manager or servers.
23          Q.    And who does quality check on the food that's
24     being prepared by the cooks?  Does someone look at it
25     before it gets sent out?
```

Page 280

```
1        A.    Yes, the manager.
2        Q.    Was it one of the manager's duties and
3    responsibilities to essentially, what is called running
4    the line, but overseeing the food that's being prepared
5    before it's sent out?
6        A.    As expectation, yes.
7        Q.    And did you do that?
8        A.    How could if I was always busy because either
9    we're short of staff or we have to expedite the food and
10   take it to the table.
11       Q.    Not my question.  Did you do that?
12       A.    Rarely.
13       Q.    Every day in the restaurant, the number of
14   guests that came to the restaurant varied on a
15   day-to-day basis; correct?
16       A.    Correct.
17       Q.    The volume of the food that was being produced
18   varied on a day-to-day basis; correct?
19       A.    Correct.
20       Q.    Employee issues, people complaining, people
21   raising things to you, it varied on a day-to-day basis
22   how frequently it happened; correct?  It could be none,
23   it could be two some days?
24       A.    Correct.
25       Q.    Okay.  Customer issues varied from day to day?
```

                                              Page 281

```
 1        A.    Possibly.

 2        Q.    And how long would that be for?

 3        A.    I don't recall.  I don't remember.

 4        Q.    And how often -- what was the frequency of

 5   that?

 6        A.    Not frequently.

 7        Q.    Once a week, once a month?  What would be your

 8   best estimation?

 9        A.    More than -- more than a month.

10        Q.    So once every two months?

11        A.    I don't recall.  I'm not going to estimate --

12   I'm not going to guess, because I don't remember.

13        Q.    I don't want you to guess.  I just want to make

14   sure whether you can provide me any estimate or whether

15   you just can't recall or are not able to --

16        A.    I don't recall.  Sorry.

17        Q.    Okay.  No problem.

18              MR. GIAMELA:  Let's take a break.

19              (Recess taken.)

20              (Exhibit 15 was marked for identification.)

21   BY MR. GIAMELA:

22        Q.    Mr. Topete, Exhibit 15 is a one-page document

23   Bates stamped 2516.  Do you see this in front of you?

24        A.    Yes.

25        Q.    Do you recognize this document?
```

Page 289

```
 1        A.    I heard about it.
 2        Q.    Okay.  The functions that are here on this
 3   list, do you believe that this is expected of a kitchen
 4   manager, not what you actually did but what the company
 5   expressed to you what it expected out of the kitchen
 6   manager position during your employment?
 7        A.    Yes.
 8        Q.    And it's your testimony that you did not do
 9   these things on a regular basis; correct?
10        A.    Correct.
11              (Exhibit 16 was marked for identification.)
12   BY MR. GIAMELA:
13        Q.    Mr. Topete, Exhibit 16 is a three-page Bates
14   stamped document, RR57 to 59.  Do you see that in front
15   of you?
16        A.    Yes.
17        Q.    Okay.  Can you look on the third page and
18   confirm for me that that is your signature?
19        A.    Yes, it is.
20        Q.    Does this look to be, to your recollection,
21   your 2014 performance review?
22        A.    I guess if I signed it, then --
23        Q.    I don't want you to guess.  You can either say,
24   "I don't recall" -- I'm asking you whether, to your
25   recollection, this is the document you signed.
```

Page 290

# HOH Shift Mechanics

**Step 1: Walkthrough**
- Review BRM Log
- Exterior/interior Observations
- Janitorial checkout
- Beautifications checked

**Step 2: Production**
- Production set; Prep lists posted
- Quality and labeling check
- Health & Safety

**Step 3: Shift Set-up**
- Phase card
- Contingency plans
- RSG's
- Training follow-up
- Beautifications assigned

**Step 4: Ordering & Receiving**
- Check in all product
- Properly labeled/rotated/stored
- Orders placed

**Step 5: Prep Follow-up**
- Prep efficiency/accuracy
- Labeling
- Cleanliness / Health & Safety

**Step 6: Line-check**
- Tools ready; timeliness
- Impact- observations
- Completion of log; follow-up

**Step 7: Pre-Shift Game Plan**
- Celebrate
- Review shift goals
- Aces in places

**Step 8: Shift Flow**
- PTA's at 9 min. or less
- Food quality; PPPP
- Health & Safety
- Security

**Step 9: HOH Phasing**
- Stocking
- First- and second-off duties
- Prep completion
- Health & Safety
- RSGB's

**Step 10: HOH Check/Transition**
- BRM log
- Shift debrief
- RSGB's
- Shift readiness
- Final walk-through

©2017 by Red Robin International, Inc.

CONFIDENTIAL

RR002516



EXHIBIT
15
Marciano Topete
6/22/18

1         I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3         That the foregoing proceedings were taken before

4    me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were administered an oath; that a record of

7    the proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction; that

9    the foregoing transcript is a true record of the testimony

10   given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of the

14   transcript [ ] was [X] was not requested.

15        I further certify I am neither financially

16   interested in the action nor a relative or employee of any

17   attorney or any party to this action.

18        IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20        Dated:  July 13, 2018

21

22

23

24

25   HEATHER HOBAN, CSR No. 10568

Page 296

# CERTIFICATE OF SERVICE

I, the undersigned, am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; am employed with Fisher & Phillips LLP and my business address is 444 South Flower Street, Suite 1500, Los Angeles, California 90071.

On July 23, 2018 I served the foregoing document entitled **DEFENDANT RED ROBIN INTERNATIONAL, INC.'S APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** on all the appearing and/or interested parties in this action by placing ☐ *the original* ☒ *a true copy* thereof enclosed in sealed envelope(s) addressed as follows:

Jonathan Jackel                              Attorney for Plaintiff
Nora Rousso                                   Marciano Topete
Rousso & Jackel
116 E. Campbell Avenue, Suite 2      Tel: (408) 378-3200
Campbell, California 95008               Fax: (408) 378-3202
                                                      jonathan@roussojackel.com
                                                      nora@roussojackel.com

☒　**[by ELECTRONIC SUBMISSION]** - I served the above listed document(s) described via the United States District Court's Electronic Filing Program on the designated recipients via electronic transmission through the CM/ECF system on the Court's website.  The Court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document(s). Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities.

☐　**[by FEDERAL EXPRESS]** - I am readily familiar with the firm's practice for collection and processing of correspondence for overnight delivery by Federal Express.  Under that practice such correspondence will be deposited at a facility or pick-up box regularly maintained by Federal Express for receipt on the same day in the ordinary course of business with delivery fees paid or provided for in accordance with ordinary business practices.

☐　**[by PERSONAL SERVICE]** - I caused to be delivered by messenger such envelope(s) by hand to the office of the addressee(s).  Such messenger is over the age of eighteen years and not a party to the within action and employed with Network Express, whose business address is 1533 Wilshire Boulevard, Los Angeles, CA 90017.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  Executed July 23, 2018 at Los Angeles, California.

Melody Martinez                              By:  /s/Melody Martinez
_____              _____
Print Name                                          Signature