LONNIE D. GIAMELA, SBN 228435
lgiamela@fisherphillips.com
SEAN F. DALEY, SBN 272493
sdaley@fisherphillips.com
FISHER & PHILLIPS LLP
444 South Flower Street, Suite 1500
Los Angeles, California 90071
Telephone: (213) 330-4500
Facsimile: (213) 330-4501

Attorneys for Defendant
RED ROBIN INTERNATIONAL, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| MARCIANO TOPETE,<br><br>            Plaintiff,<br><br>v.<br><br>RED ROBIN INTERNATIONAL, INC., a Nevada Corporation, doing business as RED ROBIN BURGER AND SPIRITS EMPORIUMS, and DOES 1 through 20, inclusive,<br><br>            Defendants. | Case No: 8:17-cv-01721 AG (JDEx)<br>*[Originally Orange County Superior Court Case No.: 30-2017-00930423-CU-OE-CJC]*<br><br>**DEFENDANT RED ROBIN INTERNATIONAL, INC.'S APPENDIX OF EXHIBITS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed Concurrently with Notice of Motion and Motion, Memorandum of Points and Authorities in support thereof, Separate Statement of Uncontroverted Facts and Conclusions of Law, Declaration of Sean F. Daley, [Proposed] Order and [Proposed] Judgment]*<br><br>Date:      August 20, 2018<br>Time:      10:00 a.m.<br>Location:  Courtroom 10D<br>          411 West Fourth Street<br>          Santa Ana, California<br><br>Complaint Filed:  July 7, 2017<br>FAC Filed:        July 27, 2017<br>Trial Date:       October 2, 2018 |

Defendant RED ROBIN INTERNATIONAL, INC. ("Red Robin") hereby submits the following Appendix of Evidence in support of its Motion for Partial Summary Judgment.

## TABLE OF CONTENTS

- Declaration of Sean F. Daley

| EXHIBIT | EVIDENCE |
|---|---|
| A | Relevant excerpts and exhibits from the certified transcript of the first volume of Plaintiff's deposition testimony from April 30, 2018. |
| B | Relevant excerpts and exhibits from the certified transcript of the second volume of Plaintiff's deposition testimony from June 22, 2018. |
| C | Relevant excerpts from the certified transcript of Rebecca Bailey's deposition testimony from May 2, 2018. |
| D | Relevant excerpts from the certified transcript of Adin Philleo's deposition testimony from May 2, 2018. |
| E | Relevant excerpts and exhibits from the certified transcript of Karin Davie's deposition testimony from May 4, 2018. |

Dated:  July 23, 2018                    Respectfully submitted,

FISHER & PHILLIPS LLP


By: */s/ Sean F. Daley*
LONNIE D. GIAMELA
SEAN F. DALEY
Attorneys for Defendant
RED ROBIN INTERNATIONAL, INC.

# EXHIBIT C

EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

 3

 4    MARCIANO TOPETE,                  )  Case No.: 8:17-cv-01721
                                        )  AG (JDEx)
 5              Plaintiff,              )
                                        )
 6         vs.                          )   CERTIFIED COPY
                                        )
 7    RED ROBIN INTERNATIONAL, INC., a )
      Nevada Corporation, doing         )
 8    business as RED ROBIN BURGER AND )
      SPIRITS EMPORIUMS, and DOES 1     )
 9    through 20, inclusive,            )
                                        )
10              Defendants.             )
      _____)

11

12

13

14

15         DEPOSITION OF REBECCA BAILEY, taken on behalf of the

16    Plaintiff, at 12777 West Jefferson Boulevard, Building D,

17    Suite 300, Los Angeles, California, commencing at 9:46

18    a.m., Wednesday, May 2, 2018, before BRITTANY SILVA, CSR

19    NO. 13940, pursuant to NOTICE.

20

21

22

23    ATKINSON-BAKER, INC.
      COURT REPORTERS
24    (800) 288-3376
      www.depo.com
25    FILE NO.: AC03A77
```

```
1              LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 2, 2018

2                             9:46 a.m.

3

4                          REBECCA BAILEY,

5    called as a witness on behalf of Plaintiff, having been

6    administered an oath in accordance with the Federal Rules

7       of Civil Procedure, was examined and testified as

8                            follows:

9

10                          EXAMINATION

11   BY MS. ROUSSO:

12      Q.   Will you please state and spell your name.

13      A.   Rebecca, R-e-b-e- yeah -c-c-a.  Lynn, L-y-n-n.

14   Bailey, B- as in boy -a-i-l-e-y.

15      Q.   And you are represented by counsel today;

16   correct?

17      A.   Yes.

18      Q.   And let me ask you first of all, have you ever

19   had your deposition taken before?

20      A.   No, I haven't.

21      Q.   So you may or may not had an opportunity to talk

22   to counsel about it.  I'll be talking to you about that

23   in a second, but for now I'm just going to go over the

24   ground rules.  You understand that although we're in an

25   informal setting, you've sworn to -- you've taken an oath
```

Atkinson-Baker Court Reporters
www.depo.com

1    recall that he held the title of kitchen manager;

2    correct?

3        A.   Correct.

4        Q.   And what, if anything, do you know about the

5    training that Mr. Topete received in order to get his job

6    as a kitchen manager with Red Robin?

7        A.   He was already established when I came on

8    board.

9        Q.   And so you don't know anything -- well, let me

10   ask you this, do you have any understanding of what his

11   salary was when he was working for Red Robin when you

12   became his regional operations director?

13       A.   I do.  I couldn't tell you exact amount, but I

14   know it was in the high 60s.

15       Q.   Okay, and along with being paid a salary, he was

16   eligible for the receipt of bonuses; correct?

17       A.   Yes.

18       Q.   And what were bonuses based on, please?

19       A.   They would be based on several different things,

20   and once again, I'd have to go back and see what 2015 and

21   '16 bonus alignments were, but typically it's what he was

22   responsible and fully owned as a kitchen manager would be

23   our COGs, cost of goods, and the food department,

24   grocery.  Everything that falls into that department.  As

25   a collective management team controlling all the other

1  Q.  Do you know whether Mr. Topete was certified as

2  a kitchen manager?

3  A.  No.

4  Q.  Can you list for me, please, Mr. Topete's duties

5  as a kitchen manager?

6  A.  As a kitchen manager, the expectation is that

7  the kitchen manager is -- takes full ownership and

8  responsibility for all heart of the house functions when

9  it comes to planning, scheduling, interviews, training,

10  developing, cross-training, running the day-to-day

11  functions, setting -- well, doing inventories, setting

12  what we call is sales mix, what's on hand, what needs to

13  be ordered.  There's several orders throughout the week

14  depends on your location and sales, health and safety.

15  Q.  Can you list specifically for me any specific

16  duty Mr. Topete performed on a day-to-day basis?  In

17  other words, you've given me kind of a broad list of

18  somewhat generalized things, and so now I want to break

19  it down and get more specific.  What were the things he

20  did typically on a day-to-day basis, if you recall?

21  A.  He typically opened.  So an opening shift would

22  be arriving to a restaurant.  You would arrive with

23  another team member.  You would walk into the building

24  together and validate that it's safe.  If the janitors

25  are still there and you walk around, make sure there's no

 1   broken windows.  You would then check out the janitor.

 2   You would look at some brief notes, if there's any 911s

 3   of any adjustments you have to make or if somebody called

 4   out sick the night before.

 5        So you're responsible for calling to try to get

 6   a shift covered.  Then you would go ahead and assign task

 7   and duties to the prep cook, and at that point then the

 8   prep cook would start getting ready, some 911s that

 9   needed to be done as he then would go in and count the

10   safe, read the manager notes from the night before, check

11   all the reports, validate the money matched, come back

12   out, make sure that the team member was on check on their

13   prep, then he would go and count what food was on hand,

14   look at the books and the pars that he had already set

15   that week, then write out the rest of the prep as well as

16   maintaining safety and sanitation.

17        We also have an internal audit department for

18   safety and sanitation that comes in, and they come in

19   unannounced like the health department, so that's

20   something a salaried manager would have to validate, that

21   we have that ready if they came in because they would

22   have to leave that audit.

23        After they got that all set up, accept orders,

24   make sure orders were put away, check for security at the

25   back door, take phone calls, then they would have to make

```
 1   sure that they have done their reset before they set
 2   their line check, do their line check, follow up on that,
 3   ready, set, go team members as they come in, talk about
 4   the focuses of the shift, make sure we are ready to go,
 5   And hopefully ready to go by 11:00.
 6        Q.   Did Mr. Topete do any prep to your knowledge?
 7        A.   No.
 8        Q.   How do you know that?
 9        A.   To my knowledge, we have team members.  I would
10   find it hard with all the administrative work that we
11   have to do in the morning, it's hard to even be ready by
12   11:00 with all the work that we have to do with reports
13   and orders and ordering.
14        Q.   And in terms of the administrative work that
15   you're referring to, did you review any documentation of
16   any of that administrative work in preparation for your
17   deposition?
18        A.   No.
19        Q.   So your statement that Mr. Topete did no prep is
20   based specifically on what other than the amount of
21   administrative work that he had to do, please?
22        A.   Yes, and the times I was there.
23        Q.   So are you saying you never saw him cook?
24        A.   I didn't see him cook, prep.  He's trying to do
25   his line check.  Usually I'm there just to certify them
```

```
 1  on line check, validate the 18 steps.
 2      Q.   Line check takes 45 minutes to an hour;
 3  correct?
 4      A.   Actually, sometimes it can take longer than an
 5  hour.
 6      Q.   Okay, and that was something he had to do every
 7  day?
 8      A.   Yes.
 9      Q.   He didn't have any choice whether or not he was
10  supposed to do that?
11      A.   He had to do line check.
12      Q.   He had to do line check.  And typically when you
13  were there, you were there to watch him doing the line
14  check; is that correct?
15      A.   We had been looking at -- it depends what the
16  visit was for, but it would be different things.  If I
17  was there to audit their training program, I'd be doing
18  the training program while we sat down.  Typically we
19  would do online checks just so that we can make all of
20  our specs, talk about the food quality, recipes if it was
21  a new promo that was out, make sure the team member
22  knowledge was there with our food promos.
23      Q.   So you said you never saw him do prep;
24  correct?
25      A.   Yes.
```

1    Q.    And you never saw him cook; is that correct?

2    A.    I don't know.

3    Q.    You don't know.  Did you ever see him do expo?

4    A.    Well, it's called a tile manager.  So he was.  I

5    did see him as a tile manager, but I've also seen him

6    front of the house manager as well when he's the only

7    manager in the building.

8    Q.    Did you ever see him do dishes?

9    A.    No.

10    Q.    What, if anything, was Red Robin's expectation

11    as to what Mr. Topete should do in the event a prep

12    person was, for example, behind on prep and it needed to

13    be done?

14    A.    Well, typically we would call in another team

15    member early or when we're projecting our hours, we know

16    what our sales are going to be, so we would schedule to

17    those hours and we'd have people on.

18    Q.    What if somehow you hadn't scheduled to those

19    hours, and someone was behind on their prep?  What, if

20    anything, was the expectation of Mr. Topete in order to

21    expedite that process?

22    A.    The expectation would be to make sure we had

23    someone come in early or maybe the prep would be on hold

24    until the evening cooks got there or after the peak

25    because we can still flow with a lunch with what we have

```
 1   he should have been doing based on the schedules.  Is
 2   that a fair statement?
 3       A.   Yes.
 4       Q.   But putting your expectations aside and putting
 5   the schedules aside, you don't know based on your own
 6   experience observing Mr. Topete, for example, how much
 7   time he spent on a given task, do you?
 8       A.   With all the administrative work, I would find
 9   it hard to believe that he can spend more than the
10   jumping in or jumping out of --
11            MR. DALEY:  She -- I think she's asking --
12            THE WITNESS:  I don't know.
13            MR. DALEY:  She's asking do you know by seeing
14   him or observing him how long he spent on any given task?
15            THE WITNESS:  No.
16   BY MS. ROUSSO:
17       Q.   And what is your understanding of how many hours
18   a day he typically worked?
19       A.   Well, we actually talked about that.  The
20   understanding as a manager you sign a contract for a 50-,
21   55-hour workweek, and I had several different people
22   report to me that he wasn't working that.
23       Q.   So he was expected to work 50 to 55 hours a
24   week; correct?
25       A.   He was expected to.
```

1    Q.   And did you ever meet with Mr. Topete about this
2    alleged failure to fulfill his obligation to work 50 or
3    55 hours a week?
4    A.   We discussed it.
5    Q.   Is there any written documentation of that
6    meeting?
7    A.   It -- that was a conversation, but after the
8    concerns that Manny, the team member, said, it was
9    mentioned in the documentation that we had that
10   discussion.
11   Q.   When you say "the documentation," you mean the
12   memorandum that you issued to Mr. Topete?
13   A.   I don't know if it's here, but there's
14   documentation and it says per the conversation that we
15   had in regards to a schedule.  I'd have to see the word
16   for word, but we did discuss his 55-hour workweek.
17   Q.   Okay.  Do you have any knowledge based on any
18   source that Mr. Topete interviewed employees for the
19   Irvine Red Robin?
20   A.   That was an expectation.
21   Q.   Right.  I understand that.  But do you have any
22   documentation of any interviews that he actually did?
23   A.   No.
24   Q.   Do you have the names of anyone that he hired?
25   A.   No.

Atkinson-Baker Court Reporters
www.depo.com

1     Q.    Do you have any knowledge that he was able to

2  hire an employee on his own without approval from anybody

3  else?

4     A.    No.

5     Q.    What is your understanding, if any, of any

6  training he did of employees who worked in the kitchen

7  where he was the kitchen manager?

8     A.    When we did the audits, we would review the

9  front of the house files -- training files and the heart

10  of the house training files, and the kitchen manager

11  would have to sign off on their observations of the skill

12  set of that team member.

13     Q.    Did you review any of those with respect to

14  Mr. Topete in preparation for your deposition?

15     A.    No.

16     Q.    Do you know if any exist?

17     A.    I don't know.

18     Q.    Do you have any information that Mr. Topete ever

19  set the rate of pay of an employee at Red Robin?

20     A.    We have starting rates typically, and based on

21  your skill set and your experience, then it would be his

22  discretion what he could start the team member off on.

23     Q.    Well, he could use his discretion in terms of

24  what Red Robin said the pay should be depending on the

25  skill set of the employee; correct?

```
1   would set his pars after inventory, and the managers
2   would set the par -- you know, follow the pars, make sure
3   we have enough product on hand.
4       Q.   Let's go off the record.
5           (Recess.)
6   BY MS. ROUSSO:
7       Q.   Mr. Topete did not have the authority to hire an
8   employee on his own; correct?
9       A.   Yes, he did.
10      Q.   Did he have -- he was able to hire someone
11  without any input from anybody else; is that right?
12      A.   No.
13      Q.   So when you say authority to hire, what do you
14  mean?
15      A.   Make the job offer.  There would be multiple
16  interviews.
17      Q.   But he could not on his own, without any input
18  from anyone else, make the final decision as to whether
19  or not to hire a given individual; is that correct?
20      A.   It depends on the situation.
21      Q.   So he could -- there were times where he could
22  and there were times where he could not?
23      A.   He could.  I mean, the expectation is they go
24  through three interviews, but it depends on the need at
25  the time and the experience of the potential team
```

Atkinson-Baker Court Reporters
www.depo.com

1    Q.    Can you name a single employee who was hired on

2    Mr. Topete's say-so alone?

3    A.    No.

4    Q.    Do you know whether Mr. Topete ever -- well,

5    you've told me he ordered products and supplies;

6    correct?

7    A.    Uh-huh.

8    Q.    Is that right?

9    A.    Yes.

10   Q.    And he took inventory; correct?

11   A.    Yes.

12   Q.    He did line checks; correct?

13   A.    Yes.

14   Q.    And I can't remember.  Did you say he did cook

15   food or he did not cook food?

16   A.    I didn't -- I don't know.

17   Q.    You don't know whether he cooked food or not?

18   A.    The expectation is -- like I said, we have our

19   team members.  We're staffed for our peaks depending on

20   the situation, if there was a time where a manger had to

21   jump in and jump out, but it would be hard to really be

22   locked in a position with all the admin and the duties

23   that we have in the front of the house.

24   Q.    Okay.  I understand all that, but my question is

25   actually very simple.  Do you know or do you not know

1      A.    Yes.

2      Q.    You've seen this document before?

3      A.    Yes.

4      Q.    And this is the job description that applied to

5   Mr. Topete when he worked as the kitchen manager;

6   correct?

7      A.    Yes.

8      Q.    And it's correct that he reported to the GM;

9   correct?

10     A.    Yes.

11     Q.    And it says there "FLSA, exempt" right at the

12  top there on the right-hand side in gray.  Or it's not in

13  gray.  Sorry.

14     A.    FLSA.  Okay.

15     Q.    What does that mean?  Do you know?

16     A.    He's a salaried manager.

17     Q.    Does the term FLSA, exempt have any other

18  meaning to you?

19     A.    That he had the job duties and the discretion to

20  interview, hire, fire, set inventories, oversee the

21  operations, terminate.

22     Q.    Okay.  Number one has a summary of the position,

23  and it says that "Mr. Topete was to support and ensure

24  that the restaurant operated within Red Robin

25  International guidelines."  See that?

Atkinson-Baker Court Reporters
www.depo.com

1    A.   Above the summary, uh-huh.

2    Q.   Well, actually underneath the --

3    A.   "Meeting and exceeding sales, responsible for

4  proper execution and operation of the kitchen department

5  including all hiring, training of assistant kitchen

6  managers and hourly team."

7    Q.   So that was a summary of his position?

8    A.   Yes.

9    Q.   So it was his job, in part, to make sure that

10  the restaurant -- the Irvine restaurant operated within

11  Red Robin International guidelines; correct?

12   A.   Yes.

13   Q.   And he did not have the discretion to deviate

14  from those guidelines, did he?

15   A.   Well, this was his expectation as a kitchen

16  manager, so --

17   Q.   Right.  Did he have the discretion to deviate

18  from Red Robin International guidelines?

19   A.   It would depend on the situation.

20   Q.   In general was he expected to ensure that the

21  restaurant operated within Red Robin International

22  guidelines?

23   A.   Yes.

24   Q.   And he was also expected to meet or exceed sales

25  and profitability objectives; correct?

1    A.    Yes.

2    Q.    The number -- Roman numeral two and going onto

3 page two lists the essential functions of Mr. Topete's

4 job; correct?

5    A.    Yes.

6    Q.    And take a look at this list.  Is there any

7 function -- essential function that he was to perform

8 that was more important than any other essential

9 function?

10   A.    It was essential for day to day to include daily

11 decision-making with team member support, guest

12 interactions, scheduling, planning while upholding

13 standards, product quality, and cleanliness.

14   Q.    So that you think was his most important

15 essential function?

16   A.    Health and safety.  These were all essential.

17   Q.    Okay, and if you could please turn to the next

18 page to Roman numeral three which lists other functions

19 and take a look at the functions listed there, and then

20 tell me if it was Red Robin's expectation that Mr. Topete

21 also performed the functions listed here in number three

22 of the job description.

23   A.    Yes.

24   Q.    Okay, and the only positions who reported

25 directly to the kitchen manager were the hourly

```
1        A.    Yes.
2        Q.    The number -- Roman numeral two and going onto
3   page two lists the essential functions of Mr. Topete's
4   job; correct?
5        A.    Yes.
6        Q.    And take a look at this list.  Is there any
7   function -- essential function that he was to perform
8   that was more important than any other essential
9   function?
10       A.    It was essential for day to day to include daily
11  decision-making with team member support, guest
12  interactions, scheduling, planning while upholding
13  standards, product quality, and cleanliness.
14       Q.    So that you think was his most important
15  essential function?
16       A.    Health and safety.  These were all essential.
17       Q.    Okay, and if you could please turn to the next
18  page to Roman numeral three which lists other functions
19  and take a look at the functions listed there, and then
20  tell me if it was Red Robin's expectation that Mr. Topete
21  also performed the functions listed here in number three
22  of the job description.
23       A.    Yes.
24       Q.    Okay, and the only positions who reported
25  directly to the kitchen manager were the hourly
```

Atkinson-Baker Court Reporters
www.depo.com

1    Mr. Topete should be separated from the company?

2        A.    Yes.

3        Q.    Thank you.  Do you have any information from any

4    source other than your attorneys that Mr. Topete was

5    separated from the company for any other reason other

6    than what's stated here?

7        A.    I don't know.

8        Q.    Okay.  Did you ever hear from any employee that

9    Mr. Topete had complained that he was working too hard

10   with Watson?

11       A.    Did I hear?  No.

12       Q.    From anyone.  Do you know what that means?

13       A.    No.

14       Q.    Watson is the -- some sort of system in place at

15   Red Robin regarding labor hours; correct?

16       A.    Our sales and labor hours.

17       Q.    Okay, and did you ever hear from any employee

18   that Mr. Topete had complained that he was being forced

19   into hourly positions?

20       A.    I don't know.

21       Q.    I'd like to have marked as Exhibit 18 an e-mail

22   from Karen Davey with a CC to you.

23            (Plaintiff's Exhibit No. 18 was marked for

24   identification by the court reporter.)

25       Q.    Do you recall receiving this e-mail?

Atkinson-Baker Court Reporters
www.depo.com

1  tile, you're responsible for running -- not running, but,

2  like, it's in our -- I don't want to go through the whole

3  18 steps, but you are responsible for going back to check

4  on health and safety, heating, cooling, the DMO, making

5  sure that the cooks -- if one side is starting to get a

6  longer ticket, you're pulling from another team member

7  from another side and saying hey, go help out that side.

8  So you're, like, responsible for the heart of the

9  house.

10       Q.   Okay.  What is phasing, please?

11       A.   As our guest counts drop and our sales drop,

12  then you start phasing out different departments.

13       Q.   That means telling people to go home?

14       A.   Yes.

15       Q.   And so it's expected that as the restaurant has

16  fewer customers, that managers are supposed to let

17  various employees go home; correct?

18       A.   Yes.

19       Q.   That's what phasing means?

20       A.   Yes.

21       Q.   And was Mr. Topete expected to phase the

22  employees in the kitchen?

23       A.   It would -- it would depend where he was working

24  that evening, but --

25       Q.   If --

1       A.    -- if there was two managers, they would both be
2    expected to phase.
3       Q.    Okay.  If he was one of -- if he was a manager
4    on duty either alone or with someone else, was he
5    expected to send employees from the kitchen home after
6    things started slowing down in the restaurant?
7       A.    Yes.
8       Q.    Thank you.  Is it your testimony that
9    Mr. Topete -- I think I asked you before if he ever did
10   things like clean the walk-in; correct?
11      A.    I don't know.
12      Q.    You don't know whether he did or not.  So I'd
13   like you to turn to number 2288 in this same exhibit.
14      A.    Okay.
15      Q.    And you see in -- from the a.m. shift notes, the
16   third column that -- or the third line that says
17   "debrief," do you see that?
18      A.    Yes.
19      Q.    It says "Marcos and Juan really detailed the
20   walk-in, mop sink, and the prep out area;" correct?
21      A.    Yes.
22      Q.    So without -- you don't know who wrote this;
23   correct?
24      A.    Yes.  I don't know.
25      Q.    But in any event someone thought that Mr. Topete

```
 1   STATE OF CALIFORNIA            )
                                    )    ss.
 2   COUNTY OF LOS ANGELES          )

 3

 4          I, BRITTANY SILVA, CSR NO. 13940, do hereby

 5   certify:

 6          That prior to being examined, the witness name

 7   in the foregoing deposition, REBECCA BAILEY, was by me

 8   duly sworn to testify the truth, the whole truth, and

 9   nothing but the truth.

10          That said deposition was taken before me at the

11   time and place therein set forth and was taken down by me

12   in shorthand and thereafter was transcribed into

13   typewriting under my direction and supervision, and I

14   hereby certify the foregoing transcript is a full, true

15   and correct transcript of my shorthand notes so taken.

16          I further certify that I am neither counsel for

17   nor related to any party to said action, nor in any way

18   interested in the outcome thereof.

19          IN WITNESS WHEREOF, I have hereunto subscribed

20   my name this 2nd day of May, 2018.

21

22

23   _____

24   BRITTANY SILVA, CSR NO. 13940

25
```

Rebecca Bailey
May 2, 2018

1

## CERTIFICATE OF SERVICE

2

I, the undersigned, am employed in the County of Los Angeles, State of California.
I am over the age of 18 and not a party to the within action; am employed with Fisher &
3   Phillips LLP and my business address is 444 South Flower Street, Suite 1500, Los
Angeles, California 90071.

4

On July 23, 2018 I served the foregoing document entitled **DEFENDANT RED
5   ROBIN INTERNATIONAL, INC.'S APPENDIX OF EXHIBITS IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

6            on all the appearing and/or interested parties in this action by placing ☐ *the
original* ☒ *a true copy* thereof enclosed in sealed envelope(s) addressed as follows:

7

8   Jonathan Jackel                                          Attorney for Plaintiff
Nora Rousso                                              Marciano Topete
Rousso & Jackel
9   116 E. Campbell Avenue, Suite 2
Campbell, California 95008                  Tel: (408) 378-3200
10                                                            Fax: (408) 378-3202
jonathan@roussojackel.com
nora@roussojackel.com

11

☒        **[by ELECTRONIC SUBMISSION]** - I served the above listed document(s)
12            described via the United States District Court's Electronic Filing Program on the
designated recipients via electronic transmission through the CM/ECF system on
13            the Court's website.  The Court's CM/ECF system will generate a Notice of
Electronic Filing (NEF) to the filing party, the assigned judge, and any registered
14            users in the case. The NEF will constitute service of the document(s). Registration
as a CM/ECF user constitutes consent to electronic service through the court's
15            transmission facilities.

16        ☐        **[by FEDERAL EXPRESS]** - I am readily familiar with the firm's practice for
collection and processing of correspondence for overnight delivery by Federal
17            Express.  Under that practice such correspondence will be deposited at a facility
or pick-up box regularly maintained by Federal Express for receipt on the same
18            day in the ordinary course of business with delivery fees paid or provided for in
accordance with ordinary business practices.

19

☐        **[by PERSONAL SERVICE]** - I caused to be delivered by messenger such
20            envelope(s) by hand to the office of the addressee(s).  Such messenger is over the
age of eighteen years and not a party to the within action and employed with
21            Network Express, whose business address is 1533 Wilshire Boulevard, Los
Angeles, CA 90017.

22

23            I declare that I am employed in the office of a member of the bar of this Court at
whose direction the service was made.  Executed July 23, 2018 at Los Angeles,
24   California.

25   Melody Martinez_____      By:   /s/Melody Martinez_____
                   Print Name                                                    Signature

26

27

28