JONATHAN JACKEL (129146)
NORA ROUSSO (150275)
ROUSSO & JACKEL
116 E. Campbell Ave., Suite 2
Campbell, California 95008

Telephone: (408) 378-3200
Facsimile: (408) 378-3202

Attorneys for Plaintiff
MARCIANO TOPETE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| MARCIANO TOPETE,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>RED ROBIN INTERNATIONAL, INC., a Nevada Corporation, doing business as RED ROBIN BURGER AND SPIRITS EMPORIUMS, and DOES 1 through 20, inclusive,<br><br>　　　　　Defendants. | CASE NO. 8:17-CV-01721 AG (JDEx)<br>*[Originally Orange County Superior Court Case No.: 30-2017-00930423-CU-OE-CJC]*<br><br>DECLARATION OF MARCIANO TOPETE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>*Filed concurrently with Plaintiff's Memorandum of Points and Authorities, Declarations of Jonathan Jackel and Erik Carpenter, Plaintiff's Opposition to Defendant Separate Statement of Uncontroverted Facts, Plaintiff's Statement of Genuine Disputes, and Plaintiff's Compendium of Exhibits]*<br><br>Date:　　　August 20, 2018<br>Time:　　　10:00 a.m.<br>Location:　　Courtroom 10D |

I, Marciano Topete, declare:

1.　　I am the plaintiff in this action and submit this declaration in opposition to defendant Red Robin's Motion for Partial Summary Judgment.

2.　　I was employed as a "kitchen manager" at the Irvine Red Robin from 2010 until May 10, 2017. More than half of my time in this position was spent working on the line in the kitchen with non-exempt employees, cooking, prepping food, and washing dishes. I also worked "expo," which involved making sure that all of the food was assembled on plates for each customer's

1 order.

2     3.    My primary duty was making sure that all of the food was prepared by the kitchen the way Red Robin wanted it, in a timely manner, and saving money on labor costs. Although I was responsible for scheduling "Heart of House" ("HOH") team members, I was limited by the budget provided to me by the general manager. Red Robin used a computer program known as "Watson," which determined how much money could be spent on labor each week. The budget was prepared by the general manager. Sometime after I started working as the kitchen manager the budgets for labor were reduced, so the kitchen was under staffed. This required me to make up the difference by doing the same hourly jobs as other kitchen employees. Otherwise, I would have hired additional staff to work in the kitchen or have the people already working in the kitchen work longer hours.

    4.    I did not hire or fire any employees. I was only able to make recommendations that were considered by the general manager, along with recommendations made by the the assistant managers. I did not train employees either.

    5.    I exercised very little discretion and independent judgment as a kitchen manager. The cooks knew how to do their jobs so they required very little supervision and direction. The procedure for ordering food and supplies was based on "par," which is the result of projections of sales prepared by the corporate offices. It was common for the cooks to order the food. The menu is also determined by corporate, as are the proportions of food for each item on the menu. Every Monday the general manager and I conducted inventory. This was primarily a matter of counting all of the items we had on hand, so it did not require any discretion or independent judgment on my part either.

    6.    Although I usually "opened" the restaurant, I was only the "manager on duty" for part of my shift two or three days per week. This is because I usually worked Thursday through Monday, with Tuesdays and Wednesdays as my days off. The general manager came in early on Mondays is order to do inventory with me and the assistant managers came in at around 11:00 a.m. on the weekends. In addition, my shift usually started at 7 a.m. and none of the "Front of House" ("FOH") employees showed up until around 10:30 a.m. The restaurant opened for business at 11:00

| | |
|---|---|
| 1 | a.m.. The assistant managers usually started no later than 3 p.m. on weekdays, so I was only the |
| 2 | "manager on duty" from 9 - 13.5 hours each week. Even when I was the "manager on duty" I still |
| 3 | spent most of my time working in the kitchen or doing expo. There were usually only three to five |
| 4 | servers during the opening shift on weekdays and there was no need for me to closely supervise |
| 5 | them. |
a.m.. The assistant managers usually started no later than 3 p.m. on weekdays, so I was only the "manager on duty" from 9 - 13.5 hours each week. Even when I was the "manager on duty" I still spent most of my time working in the kitchen or doing expo. There were usually only three to five servers during the opening shift on weekdays and there was no need for me to closely supervise them.

7. One of my duties was to "phase" employees by sending them home before the end of their shifts if business slowed down. This required very little, if any decision making on my part, since the employees generally left in the order in which they came to work. Phasing actually resulted in me having to do the work of hourly employees when the restaurant got busy again before the next shift. This included doing the work of the cooks, dishwashers, expo, and even running food.

8. I worked approximately 55 hours per week. As a result, there was another manager present most of the time that I was working. The kitchen at the Red Robin in Irvine was not hidden from view, so the general manager and assistant managers could easily see what I was doing.

9. The earnings statements provided to me by defendant state that I worked "80 hours" every two weeks, except for pay periods in which I was on vacation, was out sick, or was on limited duty. The earning statements for those periods show me working less than 80 hours. As of December of 2015 Red Robin started using a payroll system that showed my hourly rate. Attached to the Compendium of Exhibits as Exhibit 8 is copy of one of my earnings statements from Red Robin. It states that I worked 80 hours during a two week pay period even though I usually worked about 110 hours. It also states that my hourly rate was $33.51.

10. Defendant Red Robin has not paid any of the overtime owed to me since I was terminated on May 10, 2017.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 29, 2018 in Campbell, California.

_____
MARCIANO TOPETE

TOPETE v. RED ROBIN
DECLARATION OF MARCIANO TOPETE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Page 3