# EXHIBIT 3

Atkinson-Baker Court Reporters
www.depo.com

```
 1                  UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

 3

 4   MARCIANO TOPETE,                  ) Case No.: 8:17-cv-01721
                                       ) AG (JDEx)
 5            Plaintiff,               )
                                       )
 6            vs.                      )
                                       )
 7   RED ROBIN INTERNATIONAL, INC., a)
     Nevada Corporation, doing         )
 8   business as RED ROBIN BURGER AND)
     SPIRITS EMPORIUMS, and DOES 1    )
 9   through 20, inclusive,            )
                                       )
10            Defendants.              )
     _____)

11

12

13

14

15        DEPOSITION OF REBECCA BAILEY, taken on behalf of the

16   Plaintiff, at 12777 West Jefferson Boulevard, Building D,

17   Suite 300, Los Angeles, California, commencing at 9:46

18   a.m., Wednesday, May 2, 2018, before BRITTANY SILVA, CSR

19   NO. 13940, pursuant to NOTICE.

20

21

22

23   ATKINSON-BAKER, INC.
     COURT REPORTERS
24   (800) 288-3376
     www.depo.com
25   FILE NO.: AC03A77
```

1

Atkinson-Baker Court Reporters
www.depo.com

1    general e-mail.

2        Q.   You were -- is it fair to say you were confident

3    that you didn't have any e-mails from him to you?

4        A.   I'm confident.

5        Q.   Thank you.  Let's go off the record again.

6             (Discussion off the record.)

7    BY MS. ROUSSO:

8        Q.   Back on the record, please.  Can you please tell

9    me in a very general sense what, if anything, you did in

10   order to prepare for your deposition today?

11       A.   Met with Red Robin's attorneys.  We reviewed the

12   documents that I signed, some of these -- I guess I don't

13   see it, but there's a document I signed as well as just

14   talked about basic -- our 18 steps.

15       Q.   Anything else?

16       A.   Hmm.

17       Q.   And did you review a document related to the 18

18   steps?

19       A.   Well, we have our pocket pals.

20       Q.   Oh, the pocket pals.  Okay, and what are the

21   pocket pals?

22       A.   Our pocket pals has Red Robin's company

23   standards and policies when it comes to health and

24   safety, to the expectations of managers on duty, all of

25   our recipes, what to do in a case of an emergency, guest

15

Rebecca Bailey
May 2, 2018

Atkinson-Baker Court Reporters
www.depo.com

1   interaction.

2        Q.   So it's kind of like -- and correct me if I'm

3   wrong.  Is it kind of like a little rule book for people

4   like Mr. Topete who worked at the restaurant?

5        A.   I guess.  I always call it the bible of Red

6   Robin.

7        Q.   The bible of Red Robin.  Okay.  That will work.

8   Let me write that down.  Any other documents you recall

9   reviewing in preparation for your deposition?

10       A.   No.

11       Q.   You said you signed something.  I'm going to try

12  and refresh your recollection.  Do you recall if it was

13  responses to special interrogatories where you written --

14  there were questions that were written?

15       A.   I would have to see the document, but I think it

16  was just --

17       Q.   Okay.

18       A.   -- basically stating to -- to my knowledge.  I

19  would have to see it.

20       Q.   Yeah.  I think you --

21       A.   It's, like, a one-pager or something or a

22  two-pager, and then I had to sign it.

23       Q.   Okay.  We're going to get there.

24       A.   Okay.

25       Q.   Did you review anything else in preparation for

16

Rebecca Bailey
May 2, 2018

Atkinson-Baker Court Reporters
www.depo.com

1   controllables, so then it would be the bar department,

2   food, supplies, all the various budgets within our P&L.

3       Q.  Your PNO?

4       A.  Profit and loss.

5       Q.  Oh, P&L?

6       A.  P&L.

7       Q.  Anything else?

8       A.  No.

9       Q.  The other day in his deposition Mr. Topete

10  testified that his understanding of his -- the basis of

11  his bonuses was they were based on back of house, labor,

12  and food costs.  Would you agree with that or disagree

13  with that?

14      A.  I would say it's a combination of all of our

15  controllables.

16      Q.  Okay.  So am I correct when I ask you if what he

17  said is the same thing as you said, but perhaps more

18  simplified?

19      A.  I don't think it's more simplified.  You have to

20  hit all the controllable metrics to qualify.  So it's

21  just not based off of one or two.  It's based off a

22  cumulative.

23      Q.  Okay.  So maybe his list was a little short?

24      A.  I wasn't here.

25      Q.  Okay.  In your work as a regional operations

Rebecca Bailey
May 2, 2018

Atkinson-Baker Court Reporters
www.depo.com

1  director while you were -- while Irvine was in your

2  region, how often on a weekly basis were you physically

3  at the restaurant?

4       A.   On a weekly basis, I wasn't.

5       Q.   How often on a monthly basis?

6       A.   Not always a monthly.

7       Q.   So there were times when you were not in the

8  restaurant for a long -- well, how often did you go to

9  the restaurant?

10      A.   It could be anywhere from four to six weeks to

11 two months.  It depends.

12      Q.   And when you went to the restaurant, how long

13 typically would you be there?

14      A.   It depends.  If it was what we call our internal

15 audits, it's an all-day audit.  It starts as early as

16 7:00 in the morning and goes until 5:00 in the evening.

17 If it was just a restaurant visit, you can be there in

18 the morning.  You hang out during the lunch peak, debrief

19 the shift.  So it could vary anywhere from four hours to

20 eight hours.

21      Q.   What's the purpose of your visit to a restaurant

22 such as Irvine?

23      A.   The purpose?  Most of them are just to bump

24 check the managers, see how they're doing, bump check the

25 team members, make sure we have a good climate.  We're

Rebecca Bailey
May 2, 2018

Atkinson-Baker Court Reporters
www.depo.com

1   him when you first met him?

2      A.   It would probably just be a hi, I'm so-and-so,

3   where are you from, you know.

4      Q.   Okay.

5      A.   Just general.

6      Q.   Do you -- as you sit here today, do you know

7   where he was born?

8      A.   No.

9      Q.   Do you know what the highest level of education

10   he attained was?

11      A.   No.

12      Q.   Do you know where, if anywhere, he was

13   educated?

14      A.   No.

15      Q.   Thank you.  Do you know where Mr. Topete

16   received his training?

17      A.   No.

18      Q.   Do you -- Red Robin has restaurants that are

19   known as training restaurants; correct?

20      A.   Yes.

21      Q.   And Irvine is not a training restaurant, is

22   it?

23      A.   No.

24      Q.   Mr. Topete, I'll represent to you, was trained

25   at a Red Robin in Northern California in San Bruno.  Does

38

Atkinson-Baker Court Reporters
www.depo.com

1    food; correct?

2        A.    Yes.

3        Q.    And supplies; correct?

4        A.    Yes.

5        Q.    And Red Robin had a list of sources for things

6    that needed to be ordered for the restaurant; is that

7    right?

8        A.    Yes.

9        Q.    So for example, with respect to the onion rings,

10   they're frozen; right?

11       A.    Yes.

12       Q.    And Red Robin gets them from a particular

13   source; correct?

14       A.    Yes.

15       Q.    And so if Mr. Topete saw that onion rings were a

16   little low, Red Robin essentially instructed him as to

17   where he was to obtain more onion rings; correct?

18       A.    I don't understand.

19       Q.    In other words, it was expected that he would

20   order products served in your restaurant like onion rings

21   from certain vendors that Red Robin provided to

22   Mr. Topete?

23       A.    Yes.

24       Q.    Okay.  So for example, there was a list and it

25   says if you need hamburger buns, call Acme Bakery or

53

Rebecca Bailey
May 2, 2018

Atkinson-Baker Court Reporters
www.depo.com

1      A.    Yes.

2      Q.    So in other words, again, in terms of ordering

3   seasoning for Red Robin fries, Mr. Topete was told you're

4   getting this item from this supplier; correct?

5      A.    Yes.

6      Q.    And he couldn't just decide to go get it from

7   someone else; right?

8      A.    No.

9      Q.    Okay.  What does bumping fries mean?

10     A.    I would -- does it have to do with our KDS

11   system?

12     Q.    I don't know.

13     A.    I don't know, then.

14     Q.    You don't know.  What does the phrase bumping

15   fries mean to you?

16     A.    If I was getting fries out of a window, and it

17   said fries on the KDS screen, I would take the fries and

18   bump it off the screen.

19     Q.    What does that mean, "bump it off the screen"?

20     A.    There's a button you bump.

21     Q.    Okay.  You made a pushing gesture with your

22   finger.  So I'm just trying to understand --

23     A.    Yeah.

24     Q.    -- what bumping fries means.

25     A.    It's a KDS screen, so when items come up, once

Rebecca Bailey
May 2, 2018