JONATHAN JACKEL  (129146)
NORA ROUSSO (150275)
ROUSSO & JACKEL
116 E. Campbell Ave., Suite 2
Campbell, California 95008

Telephone: (408) 378-3200
Facsimile:  (408) 378-3202

Attorneys for Plaintiff
MARCIANO TOPETE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

MARCIANO TOPETE,

　　　　　Plaintiff,

　　vs.

RED ROBIN INTERNATIONAL, INC., a
Nevada Corporation, doing business as RED
ROBIN BURGER AND SPIRITS
EMPORIUMS,  and DOES 1 through 20,
inclusive,

　　　　　Defendants.

CASE NO. 8:17-CV-01721 AG (JDEx)
*[Originally Orange County Superior Court
Case No.: 30-2017-00930423-CU-OE-CJC]*

**PLAINTIFF'S TRIAL BRIEF**

Date:　　　　　October 9, 2018
Time:　　　　　9:00 a.m.
Location:　　　Courtroom 10D

Complaint Filed:　　July 7, 2017
FAC Filed:　　　　　July 27, 2017

TOPETE v. RED ROBIN
PLAINTIFF'S TRIAL BRIEF

# I.  INTRODUCTION

Under California and Federal law, the mere fact of holding the title of "manager" and being paid a salary does not compel the conclusion that an employee was properly classified as "exempt." Plaintiff Marciano Topete ("plaintiff" or "Mr. Topete") worked for defendant Red Robin International, Inc. ("defendant" or "Red Robin") for over eight years, working an average of 55 hours per week, but because his title was "Kitchen Manager," he was not paid overtime and was not provided meal or rest periods.

The evidence will show that Red Robin knew or should have known that plaintiff was spending most of his time on hourly, non-exempt tasks.  He had virtually no discretion and was able to exercise very little independent judgment.  He supervised few people and was only "in charge" of the restaurant for a small fraction of his time.  Red Robin has no records of the hours plaintiff worked or how he spent his time.

Red Robin's claim that plaintiff is exempt is based on his title, selective portions of his job description, a tortured reading of the applicable California and Federal regulations, and misplaced reliance on cases that are not apt.   It cannot sustain its burden of proving that plaintiff was exempt, so plaintiff is entitled to a premium for all the overtime hours he worked during the four year period before he filed his lawsuit.  He is also entitled to "liquidated" damages under the Fair Labor Standards, statutory damages for missed meal and rest periods, and civil penalties for inaccurate wage statement.

# II.  STATEMENT OF FACTS

Plaintiff was employed by defendant from 2008 until May 10, 2017.  The last six and a half years of his employment was at defendant's restaurant in Irvine, California.  Plaintiff's title was "Kitchen Manager." He never "managed" more than four employees in the kitchen at a time.  (Only cooks and dishwashers).  His primary duty was making sure that the food got out of the kitchen, in a timely manner, the way defendant wanted it, while saving money on labor costs.  The kitchen was chronically understaffed so plaintiff spent most of his time performing the same tasks as hourly employees.

Before working at the Red Robin in Irvine, plaintiff was trained as a kitchen manager at a

1   different Red Robin.  His training did not include anything about managing employees.  He was only

2   trained on how to properly prepare the food and do the inventory.  Plaintiff's employment file show

3   no "coaching" related to his "management" skills.

4        Red Robin restaurants are open for business from 11 a.m. to 10 p.m. on weekdays and from

5   11 a.m. to 11 p.m. on weekends.  The Irvine Red Robin employed a General Manager, two Assistant

6   Managers, and a Kitchen Manager.  There was usually an opening shift and a closing shift that the

7   managers worked.  There was also a mid-day shift on the weekends and some weekdays when it was

8   expected to be busy.

9        Plaintiff usually "opened" the restaurant, with his shift starting at 7 a.m. and ending at 5

10  p.m.  Plaintiff and the General Manager came in at about 5 a.m. on Mondays in order to do

11  inventory, which took at least two hours.  The Assistant Managers came in at about 3 p.m. for the

12  closing shift during the week.  On the weekend they came in at 11 am or 12 noon, depending on

13  whether their shift was "Early Mid" or "Late Mid."  Sometimes an Assistant Manager came in for

14  Early Mid or Late Mid during on weekdays.  Because plaintiff's days off were usually Tuesday and

15  Wednesday, he was the "manager on duty" only on Thursdays and Fridays until 3 p.m.  "Front of the

16  House" ("FOH") employees didn't start showing up until around 10:00 a.m., so plaintiff was only

17  the "manager on duty" from 10 a.m. to 3 p.m. on no more than two week days.  On the weekend he

18  was the "manager on duty" from only 10 a.m. until 11 a.m. or 12 noon.  As a result, he was the

19  "manager on duty" for no more than 14 hours per week.

20       After plaintiff opened the restaurant, the first cook arrived at about 8 a.m.  The other two

21  cooks usually arrived at about 10 a.m.  There were only three to five servers working the opening

22  shift, plus a hostess and bartender.  They arrived between 10 and 11 a.m.

23       Dishwashers were rarely scheduled during weekday opening shifts.  A dishwasher would

24  not show up until 5 pm, at the end of opening shift.  Expeditors or Expos[1] were only scheduled

25  during the opening shift on weekends and occasional weekdays.  Plaintiff had no control over their

26  schedule since they were considered part of the Front of House.

27

28       [1]"Expo" is plating the dishes.  Red Robin specified how every menu item must be plated.

TOPETE v. RED ROBIN
PLAINTIFF'S TRIAL BRIEF                                                              Page 2

1   Between 7 a.m. to 8 a.m. plaintiff checked the "face cards," which have all the projections
2   and employee schedules, and the "captain's logs" which recorded events from the day before.  This
3   took about ten minutes.  He then moved to "production," counting what was on hand and what
4   needed to be prepared.  This took about a half hour.  He also got the bath of ice ready for the
5   tomatoes and lettuce.  This took about 15 minutes.
6   Between 8 a.m. and 10 a.m. plaintiff helped prep the food.  As food was prepared, plaintiff
7   had to wash the pots and pans.
8   Plaintiff started the "line check" at 10 a.m.  This involved going through a checklist and
9   took about 45 minutes.  He would then get the expo area ready, by putting out ice and ladles for the
10  dressing, and anything else that needed to be kept on ice.  This took about 15 minutes.  He was also
11  responsible for making sure that the heating and cooling charts were prepared.
12  Plaintiff was also responsible for the "Steritech walk-through."  This was a check list that
13  was used to verify that the kitchen complied with cleanliness and safety standards.  It was supposed
14  to be done at the beginning and end of every shift, but this didn't always happen because of how
15  busy they were.
16  Plaintiff seated guests for a few minutes when the restaurant opened at 11 a.m.  He did this
17  until the hostess arrived at about 11:15 a.m.  After that he went back to the kitchen where he spent
18  the rest of his time cooking and washing dishes.  He also did the expo when no expo was scheduled
19  and had to run food in order to help the servers when they were busy.
20  After the lunch rush plaintiff would send kitchen employees on their rest breaks and cover
21  for them.  At some point whoever was the "manager on duty" would decide if business had slowed
22  down enough to "phase" employees by sending them home before the end of their shift.  If it got
23  busy again before the next shift, plaintiff would have to cover for the cooks and expos that were sent
24  home.
25  The closing shift manager arrived between 3 and 3:30 p.m.  At that time plaintiff was still
26  helping the cooks and washing dishes.  The transition to the closing shift would start between 4 and
27  4:30 p.m. when the first cook arrived.  The second cook came in at about 5 p.m. and a third cook
28  came in between 5:30 and 6 p.m.  Plaintiff would not leave before the second cook came in.  He

1  frequently stayed later.

2          Even while plaintiff was the "manager on duty" he still had to make sure that the food got

3  out of the kitchen the way defendant wanted it, so in reality he spent very little (if any) time

4  supervising Front of House employees.  He still spent most of his time working in the kitchen

5  cooking, washing dishes, or doing expo

6          On the weekends plaintiff actually spent more time working in the kitchen since the

7  restaurant was busier.  He did not have to worry about the FOH since another manager arrived at 11

8  a.m. or 12 noon.  This was true during "Golden Times," Red Robin's name for busy periods during

9  the summer and holidays.

10          Outside of the daily routine, plaintiff attended a managers meeting at the restaurant once a

11  week (usually Monday afternoon) and was responsible for preparing the schedules for people

12  working in the kitchen.  The schedules only took about an hour to prepare and were usually prepared

13  by Jose or Jorge, who were cooks.  The number of staff hours that could be scheduled depended on

14  the budget prepared by the General Manager, who had to approve the schedule.  The budget was not

15  large enough to fully staff the kitchen.  This was because defendant wanted labor costs reduced in

16  accordance with the projections created by the "Watson" computer program.   Plaintiff was expected

17  to make up the difference by doing the same hourly jobs as other kitchen employees.  Otherwise, he

18  would have hired additional staff to work in the kitchen or have the people already working in the

19  kitchen work longer hours.

20          The weekly inventory on Monday mornings took about two hours.  After the General

21  Manager entered all the numbers into the computer, plaintiff would go back and check on items if

22  there was a variance.  New products were ordered after completing the inventory.  This took about an

23  hour, but was usually done by Jose or Jorge while plaintiff cleaned and cooked food.  The general

24  manager was aware of this.

25          When plaintiff was the "manager on duty" he occasionally had to respond to customer

26  complaints.  At times this required him to "comp" a meal.  This happened rarely.

27          The kitchen is easily visible from the dining area.  Plaintiff talked to each of his General

28  Managers about how much time he was spending on nonmanagerial duties.  Despite this, defendant

1 claims it doesn't know how much time plaintiff spent on any particular duty.  This is unhelpful to

2 defendant, because it knew that the Red Robin "Employee Handbook," which included a "California

3 Addendum," stating that "[e]xempt or non-exempt status is determined by the actual job, not the job

4 title."  Defendant knew or should have known what plaintiff was doing.

5       Defendant knew that plaintiff had to spend "more than half of his time doing exempt work

6 in order to be classified as exempt under California law."  Defendant's Employee Handbook states

7 that what an employee does is more important than their title.  Defendant also knew that it needed to

8 know what plaintiff was doing and not merely what was "expected" based on his "job description."

9 Despite this, defendant has no evidence of anything it did to determine the amount of time plaintiff

10 spent on exempt duties.

11       Plaintiff spent way less than half of his time exercising discretion and independent

12 judgment.  He had no discretion as to items on the menu; the menu is the same for customers across

13 the country.  The guests needed to have the same Red Robin experience whether they're in Maine,

14 North Carolina or Irvine.   Plaintiff had no independent judgement or discretion with respect to

15 managing inventory or ordering food and supplies for the kitchen.  The same goes for how food was

16 prepared.  Every step of the process was controlled by specifications contained in the "Pocket Pal,"

17 which has been described as "the Bible" and "the coach."  The Pocket Pal includes standards for

18 cleaning, storing food, and recipes.  It specifies the exact proportions for every item on the menu.

19       Plaintiff did not train employees; Irvine was not a training store.

20       Plaintiff did not have the authority to hire or fire anyone.  He could only make

21 recommendations.  Any recommendations he made were discussed by a committee which included

22 the General Manager and the Assistant Managers, with the General Manager having the final say.

23 Plaintiff's recommendation was not followed the one time he recommended firing someone.

24       Plaintiff worked approximately 55 hours per week.  This means that there was another

25 manager present most of the time that plaintiff was working.  (55 hours minus 14 hours equals 41

26 hours.)

27       Despite defendant's classification of plaintiff as exempt, each of his earnings statements

28 state he worked "80 hours" every two weeks, except for pay periods in which he was on vacation,

TOPETE v. RED ROBIN
PLAINTIFF'S TRIAL BRIEF                                                                    Page 5

was out sick, or was on limited duty.  The earning statements for those periods show him working less than 80 hours.  As of December of 2015, defendant started using a payroll system that showed plaintiff's hourly rate.

Red Robin's motto is that it "gives its guests the gift of time."  The kitchen is expected to get the food out fast.   Defendant also wanted to keep labor costs down.  It admittedly knew that from "time to time" that plaintiff had to step in to cook and wash dishes so they could **"deliver on their promises to guests."**  Red Robin knew there were times when a manager stepped in to cook to help the team.  Even the General Manager had to step in from time to time to wash dishes  Defendant also knew from the "Captain's Log" that plaintiff had physically cleaned up in the kitchen and helped out on at least one occasion on his day off when the restaurant was understaffed.

Defendant claims that one of plaintiff's "management" duties was to "phase" employees by sending them home before the end of their shifts if business slowed down.  This required very little, if any, discretion by plaintiff, since the General Manager usually directed plaintiff to phase the employees and they generally left in the order in which they came to work.  This resulted in plaintiff having to do the work of the hourly employees when the restaurant got busy again before the next shift.  This included doing the work of the cooks, expo, and even running food.

### III.  LEGAL ARGUMENT

A.      **PLAINTIFF WAS MISCLASSIFIED AS A MANAGER.**

California Labor Code §510 and 29 U.S.C. §207 both require employers to pay "non-exempt" hourly employees time and a half for all hours exceeding 40 in a week.[2]  Employers are not excused from complying with this requirement unless the employer can prove that an employee is exempt as an executive, administrator, or professional.  *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,* 515 F. 3d 1150, 1156 (11th Cir. 2008).  The exceptions must be narrowly construed as to only apply to those "clearly and unmistakenly within the terms and spirit of the exception."  *Morgan*

---

[2]Labor Code Section 510 also requires employers to pay non-exempt employees time and a half for all hours exceeding eight in a day, but that is not at issue here since plaintiff usually worked at least five days per week.  Coverage under the FLSA is triggered by the "interstate commerce" requirement.  This does not appear to be an issue due to the volume of respondent's business and the proliferation of Red Robin restaurants all over the country.  (See: 29 U.S.C. Sections 203 and 207.)

1   *v. Family Dollar Stores, Inc.,* 551 F. 3d 1233, 1269 (11ᵗʰ Cir., 2008).  They must be proven with

2   "clear and affirmative evidence."  *Archuleta v. Wal-Mart Stores, Inc.,* 543 F. 3d 1226, 1233 (10ᵗʰ Cir.

3   2008.)

4          **1.     The California Exemption.**

5          The standard for determining whether a kitchen "manager" can be exempt as an executive

6   under the California Labor Code is found in Section 1(B)(1) of Wage Order 5-2001.  It requires an

7   employer to prove the following:

8          (a)     The employee's duties and responsibilities involve management of the enterprise
                   or a customarily recognized department of that enterprise; and

9
10         (b)     The employee customarily and regularly directs the work of two or more other
                   employees; and

11         (c)     The employee has the authority to hire or fire other employees or their suggestions
                   and recommendations are given "particular weight;" and

12
13         (d)     The employee customarily and regularly exercises discretion and independent
                   judgment; and

14         (e)     The employee is "primarily" engaged in duties which meet the test of the
                   exemption.

15
16         Section 2(O) of Wage Order 5-2001 defines "primarily" as "more than one-half of the

17   employee's time."  This definition of "primarily" is a quantitative test.  The employer's "realistic

18   expectations" can also be considered.

19         Subsection 1(B)(1)(e) of Wage Order 5-2001 states that "[t]he work actually performed by

20   the employee during the course of the work week must, first and foremost, be examined and the

21   amount of time the employee spends on such work, together with the employer's realistic

22   expectations and the realistic expectations of the job, shall be considered in determining whether the

23   employee satisfies this requirement."  It is not a "two step process" where an employer can prove the

24   exemption with evidence of its "expectations."

25         The California Supreme Court held in *Ramirez v. Yosemite Water Co.* (1999) 20 Cal. 4ᵗʰ

26   785, 801-802, held that the quantitative test set forth in the Wage Order is not simply a matter of

27   determining the number of hours, then determining the employer's expectations.  It is a matter of

28   weighing both considerations:

Having recognized California's distinctive quantitative approach to determining which employees are outside salespersons, we must then address an issue implicitly raised by the parties that caused some confusion in the trial court and the Court of Appeal: Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee *should* be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the IWC's quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job. In so doing, **the court should consider, first and foremost, how the employee actually spends his or her time.** But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and **whether these expressions were themselves realistic given the actual overall requirements of the job.** *Ramirez v. Yosemite Water Co., supra,* 20 Cal. 4th at 801-801.

Subsection 1(B)(1)(e) of Wage Order 5-2001 also establishes the standards for determining whether work is exempt or non-exempt. "The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective **as of the date of this order**: 29 C.F.R. Sections 541.102, 541:104-111, and 541.115-116." (Some of these regulations were changed since the effective date of Wage Order 5-2001.)

The 2001 version of Section 541.102 states that the following is "exempt" work:

Interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

Plaintiff did not set or adjust rates of pay; maintain production or sales records; appraise productivity or efficiency; handle complaints or grievances; plan the work; determine the techniques to be used; determine the type of materials, supplies, machinery or tools to be used or merchandise to

be bought, stocked and sold; control the flow and distribution of materials or merchandise and supplies; or provide for the safety of the men and the property.  All of this was done by upper management.

While plaintiff interviewed prospective employees, directed their work, set their schedule, and ordered supplies, this required very little of his time.  He did not have the authority to hire or fire employees and had no involvement in training them.  Everyone plaintiff "supervised" already knew their job.  He rarely had to tell anyone what to do.  The only part of plaintiff's job that really required any kind of discretion or independent judgment was creating the schedules and "phasing" employees. Creating the schedule only took about one hour per week and was usually delegated to one of the cooks.  "Phasing" refers to sending employees home when business is slow.  This only took a few minutes to decide.  In addition, employees usually left in the same order in which they came to work.

The 2001 version of 541.107(b) explains what is meant by the regular "exercise of discretion:"

> The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant.  The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretionary powers in the day-to-day performance of his duties.  The requirement is not met by the occasional exercise of discretionary powers.

The bit of discretion exercised by plaintiff was not on a "day-to-day" basis, only occasionally.  The most discretion he had was in the preparation of schedules, which was only once a week and often delegated to other team members.  Almost everything else he did was routine and formulaic.  It is highly unlikely that defendant can prove this element of the exemption.

Defendant may argue that some of plaintiff's other duties were exempt because they "were directly and closely related" to his management duties.  The 2001 version of Section 541.108 states that this includes "a great many directly and closely related tasks which are **different from the work performed by subordinates** because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible." (Emphasis added.)

None of the work that any of the nonexempt employees also did can be considered "directly and closely related."  In addition, the regulation cautions: "Frequently it is difficult to distinguish the managerial type from the type which is a production operation.  In deciding such difficult cases it

1    should be borne in mind that it is one of the objectives of Section 541.1 to exclude from the

2    definition foremen who hold 'dual' or combination jobs."

3              The 2001 version of Section 541.115 distinguishes between a "working" foreman and a

4    bona fide executive:

> One type of working foreman or working supervisor most commonly found in
> industry works alongside his subordinates.  Such employees, sometimes known as
> strawbosses, or gang or group leaders perform the same kind of work as that
> performed by their subordinates, and also carry on supervisory functions.  <u>Clearly, the
> work of the same nature as that performed by the employees' subordinates must be
> counted as nonexempt work and if the amount of such work performed is substantial
> the exemption does not apply.</u>  (Emphasis added.)

9    This broadly describes what plaintiff did.  He worked alongside his "subordinates," doing the same

10   work as them most of the time.  He spent very little time performing "supervisory functions."  He

11   was nothing but a "strawboss."  The reference to this regulation in Wage Order 5-2001 is significant.

12             In deposition, defendant's witnesses tried to downplay the amount time plaintiff spent

13   doing hourly work, saying he only occasionally "popped into the kitchen" or "hopped on the line."

14   There is no evidence to support this claim.

15             Defendants may also claim that time spent by plaintiff doing non-exempt work such as

16   cooking, washing dishes, and expo should also be considered as "management" because he was

17   simultaneously supervising other team members.  This would be contrary to *Heyen v. Safeway, Inc.*

18   (2013) 216 Cal. App. 4th 795, 822, which held that the regulations in effect in 2001 "do not recognize

19   'hybrid' activities - i.e. activities that have both 'exempt' and 'nonexempt' aspects.  Rather, the

20   regulations require that each discrete task be separately classified as either 'exempt' or 'non-

21   exempt.'"  *Heyen* also held that "work of the same kind performed by a supervisor's non-exempt

22   employees generally is 'non-exempt,' even when that work is performed by a supervisor."  *Ibid.*

23             The court rejected Safeway's argument that its "managers" managed other employees while

24   doing work normally done by non-exempt employees, such as stocking shelves and working at the

25   cash register.  The argument should be rejected here too.  Plaintiff was not "managing" other

26   employees when he washed dishes, prepped food, cooked, and did other non-exempt jobs.  The

27   "multi-tasking" argument cannot be used to justify paying plaintiff a salary under the California

28   Labor Code.

*Heyen v. Safeway, supra,* was followed by *Martinez v. Joe's Crab Shack Holdings* (2013) 221 Cal. App. 4th 1148, a class action in which restaurant managers claimed they were improperly classified as exempt.  The Court of Appeal ruled that tasks like "inventory, restocking serving, cooking, bussing tables, cleaning and other tasks ordinarily performed by nonexempt employees remain nonexempt when performed by a managerial employee.  Likewise, when a managerial employee fills in for a nonexempt employee, the task remains nonexempt." *Id.* at 1164.  The Court observed that "[a]s in *Heyen,* the gist of plaintiffs' claim here is that regardless of the patina of managerial discretion expressed in their job description, they functioned consistently as utility workers, cross-trained in all tasks, who could be assigned to fill in where needed without affecting the labor budget or requiring overtime compensation."  The same holds true here.  None of the time plaintiff spent cooking, washing dishes, doing expo, and other non-exempt jobs can be considered exempt.  Plaintiff easily spent more than half and possibly as much as 80% of his time doing hourly work.  Any "expectations" defendant may have had to the contrary were not "realistic" because the kitchen was understaffed.  They should not be considered.  Defendant knew or had reason to know that plaintiff spent most of his time doing nonexempt work.  He should have been paid by the hour.

### 2.    The Federal Exemption.

The requirements for classifying an employee as an executive under the Fair Labor Standards Act are similar, but different in ways that may cause confusion.  In order to understand the differences and determine whether the federal exemption applies, one must carefully exam the current federal regulations.  Section 541.100(a) of Title 29 of the Federal Code of Regulation lists the following requirements:

(1)    The employee's salary is not less than the 40th percentile of salaried workers;

(2)    The employee's "primary" duty is management of the enterprise or a customarily recognized department:

(3)    The employee customarily and regularly directs the work of two or more employees; and

(4)    The employee has the authority to hire or fire other employees or their suggestions and recommendations are given "particular weight."

At first glance, the only difference between the State and Federal standards is that the

TOPETE v. RED ROBIN
PLAINTIFF'S TRIAL BRIEF                                                          Page 11

1  Wage Order requires that a manager regularly and customarily exercises independent judgment

2  while the Federal regulation requires that a manager make above a certain salary.  However, the real

3  difference is in how these regulations define the terms "primarily" and "primary."

4      While Section 2(O) of Wage Order 5-2001 defines "primarily" as "more than one-half of

5  the employee's time,"  Section 541.700 of Title 29 of the Federal Code of Regulations provides a

6  more nuanced standard for determining whether management is an employee's "primary" duty:

> (a)  To qualify for exemption under this party, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.
>
> (b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

    Before determining whether the plaintiff's "primary duty" was management, one must first determine which of his duties were "managerial."  29 C.F.R. Section 541.102 provides a long list of "examples of managerial work" which is a bit longer than the examples included in the 2001 version of this regulation:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and

TOPETE v. RED ROBIN
PLAINTIFF'S TRIAL BRIEF          Page 12

1    monitoring or implementing legal compliance measures.[3]

2        There is no evidence that plaintiff selected or trained employees; that he set or adjusted the

3    pay rates of employees; that he maintained production or sales records; that he appraised

4    employees' productivity or efficiency for the purpose of recommending promotions or other

5    changes of status; that he handled employee complaints and grievances; that he planned the work;

6    that he determined the techniques to be used; that he apportioned the work among the employees;

7    that he determined the type of materials, supplies, machinery, equipment or tools to be used or

8    merchandise to be bought, stocked and sold; that he controlled the flow and distribution of materials

9    or merchandise and supplies; that he provided for the safety and security of the employees or the

10   property; that he planned and controlled the budget; or that he monitored or implemented legal

11   compliance measures.

12       Out of the list of examples recited in this regulation, the only ones that apply to plaintiff

13   are interviewing employees, scheduling employees, and directing their work.  He spent very little

14   time doing any of these things.  Interviews were occasional and scheduling took about one hour

15   each week.  The amount of time plaintiff spent "directing" the work of employees depends on how

16   one views this term.  Plaintiff very rarely had to actively direct any employees.  The employees who

17   worked in the kitchen with him knew how to do their job and required very little, if any, direction.

18   The same was generally true for the employees who worked in the "Front of House" when plaintiff

19   was the "manager on duty."

20       In *Marzuq v. Cadete Enterprises, Inc.,* 807 F. 3d 431,   (1st Cir. 2015) it was held that

21   determining whether management is the "primary duty" under the F.L.S.A. requires the Court to

22   apply the four factors set forth in Section 541.700.  The plaintiffs in *Marzuq* were general managers

23   of two separate Dunkin' Donuts stores.  Each was the only person in charge, so their duties included

24   "calibrating the equipment..., handling cash, keeping the store and grounds properly maintained,

25

26   _____

27       [3]  "The new regulations are similar and explain that generally management includes, but is not limited to, the same
     conduct listed in the old regulations, but adds these examples of managerial tasks: 'planning and controlling the budget; and
28   monitoring or implementing legal compliance measures.'" *Morgan v. Family Dollar Stores,* 551 F. 3d 1233, 1266 (11th Cir.
     2008)

1   training and supervising employees, periodic counting of every non-perishable item in the store, and

2   substantial paperwork." *Id.* at 434.  The plaintiffs had a district manager who "determined staffing

3   levels, arranged maintenance, and ordered the baked goods for the stores," but he only visited the

4   store once a week.  *Ibid.*  Despite the plaintiffs' title of manager, and being the only manager who

5   physically worked at the store, one of them testified that he had to spend 90 percent of his time

6   "serving customers, cleaning, cleaning the outside, doing the landscaping, cleaning the papers out of

7   bushes, cleaning the bathroom, serving customers, covering shifts, employees that call in, I have to

8   cover."  He also testified that "he could not delegate clean-up to crew members, 'because you're

9   always short on staff.'" *Ibid.*

10          The appellate court reversed the trial court's order granting summary judgment for the

11   employer.  While a Dunkin' Donuts store may be much smaller than a Red Robin restaurant, the

12   circumstances are similar.  The main difference is that the plaintiffs in *Marzuq* were responsible for

13   managing the entire store, while Mr. Topete was only responsible for the kitchen.

14          The first factor examined and applied in *Marzuq* was the "relative importance of plaintiffs'

15   exempt and other duties."  On one hand the plaintiffs "generally oversaw the day-to-day operation

16   of the stores."  On the other hand, the "testimony permits the conclusion that, as a factual matter,

17   the non-managerial work also was 'critical to the success of the restaurant.'" *Id.* at 440.  They

18   needed to do exempt work because they were rarely fully staffed. "If, contrary to their job

19   descriptions, managers could not prioritize their supervisory duties because 'quality Customer

20   Service' demanded that they regularly perform tasks ordinarily assigned to hourly employees, a fact

21   finder could reasonably conclude that plaintiffs' exempt and nonexempt duties were equally

22   important to the successful operation of their restaurants." *Id.* at 441.

23          The second factor examined in *Marzuq* was the "amount of time spent on exempt work."

24   Although the current regulations permit "the concurrent performance of exempt and nonexempt

25   tasks," there was evidence that the plaintiffs' "supervisory role was, at least at times, overwhelmed

26   by his non-managerial tasks."  Thus, there was a question of fact of how much time the plaintiffs

27   were actually "in charge," so "the second factor - - like the first [did] not point decisively in either

28   direction." *Id.* at 442.

1      The third factor is "freedom from direct supervision."  Since the plaintiffs were the only

2  managers employed at each store, they had much more freedom from supervision than Mr. Topete.

3  Nonetheless, the Court found it significant that staffing levels were determined by the district

4  manager, managers at each store were expected to follow "uniform procedures," had limited

5  authority to solve problems, and could not hire or fire anyone without the district manager's

6  approval.  The Court of Appeals found that this factor "tended to favor the plaintiffs." *Id.* at 443-

7  444.

8      The last factor is "the relationship between plaintiffs' salaries and wages paid hourly

9  employees for similar nonexempt work."  Although the plaintiffs' salary was much higher than it

10  would be for the nonexempt employees working a 40 hour work week, it turned out to be not much

11  more when the amount of overtime was factored in.  The Court of Appeal found that this was

12  "squarely in plaintiff's favor." *Id.* at 444-445.

13      The relationship between Mr. Topete's salary and the wages paid to non-exempt

14  employees working in the kitchen is the only factor that might weigh in Red Robin's favor.  The

15  other three factors definitely weigh in favor of Mr. Topete.  The time he spent cooking, cleaning,

16  and doing expo work, was just as important (if not more important) than his managerial duties.

17  Without him doing this work Red Robin would not have been able to keep its promise of "giving

18  people the gift of time."  The amount of time spent on exempt duties was minimal.  Just like the

19  plaintiffs in *Marzuq,* Mr. Topete was frequently overwhelmed by his nonexempt duties.  He had

20  much less freedom from supervision than the plaintiff in *Marzuq,* so there should be no question

21  that the four factors weigh in favor of finding that management was not Mr. Topete's "primary

22  duty."  In addition, "[t]he amount of time spent performing exempt work" is still "a useful guide in

23  determining whether exempt work is the primary duty of an employee."  29 C.F.R. 541.700(b).

24      Defendant's Motion for Summary Judgment cited five cases in its discussion of "primary

25  duty" that it will presumably rely on in its trial brief.  They include *Donovan v. Burger King Corp.*,

26  672 F. 2d 221 (2d Cir.1982); *Donovan v. Burger King Corp.*, 675 F. 2d 516 (1st Cir. 1982);

27  *Musgraves v. Sears Holding Mgmt. Corp.,* No. 11-0625, 2012 WL 3222905, 12 (C.D. Cal. July 19,

28  2012); *Jackson v. Advance Auto Parts, Inc.,* 362 F. Supp. 2d 1323 (N.D. Ga. 2005); and *Murray v.*

*Stuckey's, Inc.*, 939 F. 2d 614 (8th Cir. 1991).  None of these case are applicable here as they all involved managers who spent most of their time in charge of an entire store or restaurant and were subject to very little supervision.  One case is unpublished.

In both of the *Burger King* cases the plaintiffs were assistant managers who were "in charge" of the restaurants during most of their shifts and supervised up to 25 employees at a time. There were only "brief periods of overlap" between the shifts on Fridays and Saturdays.  *Donovan v. Burger King, supra,* 672 F. 2d at 221.  "There are substantial periods of time during which an Assistant Manager is the sole supervisor in the restaurant."  *Donovan v. Burger King, supra,* 675 F. 2d at 517.  "Given that 10-25 employees under their direction are teenagers, many on their first job, this supervision is a not insubstantial responsibility."  As a result, it was "clear that the restaurants could not operate successfully unless the managerial functions of Assistant Managers...were performed."  *Id.*  at 521.

*Musgraves v. Sears Holding Mgmt. Corp., supra,* is not a published decision.  It is an order granting the employer's motion for summary judgment in a case in which the plaintiff was the general manager of a K-Mart store that employed about a 100 people, including four assistant managers, an HR assistant, loss prevention personnel, nine or ten hourly lead employees, and dozens of lower level hourly employees.  His duties included reviewing daily sales reports, investigating the causes for under-performance, addressing those causes, using his discretion to increase order levels for merchandise that would sell better in certain seasons, confirming that employees knew how to work the inventory and price checking scanner, managing the flow of merchandise, making sure sale proceeds were timely deposited and accurately accounted for, working with loss prevention personnel, and complying with regulatory laws.  He also supervised other employees, coached and trained employees, managed the store's budget, and was responsible for hiring, firing, and promoting hourly employees.  This is an incomplete list, but illustrates why this was exactly the type of case in which the number of hours a manager spends doing non-exempt work is outweighed by other factors.    The three plaintiffs in *Jackson v. Advance Auto Parts, Inc., supra,* were employed as assistant managers at three different Advance Auto Parts stores.  They claimed that they were non-exempt because they spent 90% of their time selling auto parts,

1    operating the cash register, and cleaning the store.  However, each of the assistant managers

2    admitted they were in charge of the entire store 60% of their working hours, and during those hours

3    they were responsible for managing all store operations.  This included directing the work of other

4    employees, which they were able to do while supervising other employees.  This lead the court to

5    conclude that management was their "primary duty," but this was without analyzing the four factors

6    set forth in 29 C.F.R. 541.700(a), so it is a questionable decision.

7        The plaintiffs in *Murray v. Stuckey's, Inc., supra,* were generals manager of roadside

8    stores along interstates and other major highways that combined gas stations, convenience stores,

9    and restaurants.  They spent 65 to 90 percent of their time doing non-exempt work, such as

10   pumping gas, waiting on customers, and stocking shelves.  The Court of Appeals found that their

11   "primary duty" was management because they were "ultimately in charge of all operations on the

12   premises."  This was based on 29 C.F.R. 541.113(e) which stated that the "sole charge exception"

13   requires that "the employee must ordinarily be in charge of all the company activities at the location

14   where he is employed."  *Murray v. Stuckey's, Inc., supra,* 939 F. 2d at 620.  This regulation no

15   longer exists, so this case is of no help in determining whether management was Mr. Topete's

16   "primary duty."  Even if it did exist, it would not apply since Mr. Topete was never "in charge of all

17   the company activities" at the Red Robin location in Irvine.

18       Unlike the five cases relied upon by defendant in its motion for summary judgment, the

19   Court of Appeals found in *Morgan v. Family Dollar Stores, Inc.,* 551 F. 3d 1233 (11th Cir. 2008)

20   that a general manager of a store did not have management as her "primary duty."  The Court of

21   Appeals affirmed the jury's verdict after applying all four of the factors listed in 29 C.F.R.

22   541.700(a).  Although managers were in charge of the store during all of their working hours, they

23   "rarely exercised discretion because either the operations manuals or the district managers'

24   directives controlled virtually every aspect of a store's day-to-day operations."  Non-managerial

25   tasks took up 90% of a store manager's time and were found to be of equal or greater importance to

26   the store's success.  *Id.* at 1270.  The evidence showed that the store managers were not free from

27   supervison because "the combination of sweeping corporate micro-management, close district

28   manager oversight, and fixed payroll budgets left store managers little choice in how to manage

1   their stores and with the primary duty of performing manual, not managerial tasks." *Id.* at 1271.

2   The store managers earned only slightly more than the hourly employees after factoring in the

3   number of hours they worked, so all four factors supported the jury's finding that the store managers

4   should not have been classified as exempt. *Id.* at 1271-1273.

5           Of particular interest in *Morgan, supra,* is the court's observation that the "store managers

6   spent only 10 to 20% of their time performing exempt work, a far cry from the DOL's 50%

7   guideline for management tasks." It also noted that "Family Dollar never studied what store

8   managers actually did on a day-to-day basis or the amount of time store managers spent on

9   managerial duties." *Id.* at 1270-1271.

10          Unlike any of the managers in any of these cases, Mr. Topete was only left "in charge" of

11  the restaurant for no more than fourteen hours per week. This was no more than 25% of his time,

12  since he worked an average of about 55 hours per week. As a result, there is no reason to deviate

13  from the four factors for determining whether management was his primary duty.

14          In addition to management not being Mr. Topete's primary duty, he did not have the

15  authority to hire or fire employees as required by 29 C.F.R. 541.100(a)(4). Nor were his

16  recommendations given "particular weight." Rather than specifically define this term, 29 C.F.R.

17  541.105 states that the following factors which should be considered: "whether it is part of the

18  employee's job duties to make such suggestions and recommendations; the frequency with which

19  such suggestions and recommendations are made or requested; and the frequency with which the

20  employee's suggestions and recommendations are relied upon." Mr. Topete was only rarely asked to

21  interview candidates for the kitchen staff. Nor did Red Robin rely on his recommendations. Hiring

22  decisions were made by the General Manager after meeting with Mr. Topete and the Assistant

23  Managers. On the one occasion when Mr. Topete recommended that an employee be fired, his

24  recommendation was disregarded. In reality, he had very little authority.

25          This case is not unlike *Morgan v. Family Dollar Store.* Mr. Topete rarely exercised

26  discretion because of the routine and formulaic nature of the kitchen operations. Non-managerial

27  tasks took up about 85% of Mr. Topete's time and were of equal or greater importance to the store's

28  success since the budget did not permit full staffing, and getting the food out on time was

TOPETE v. RED ROBIN
PLAINTIFF'S TRIAL BRIEF

paramount.  Mr. Topete was not free from supervison.  He was subject to corporate micro-

management as well as being supervised by the General Manager.  He had no choice on how to run

the kitchen.  He was essentially nothing more than a "strawboss" or "foreman."  "Management" as

this term is used in 29 C.F.R. 541.102 was not his primary duty.

## B.  DEFENDANT HAS THE BURDEN OF PROVING THAT PLAINTIFF DID NOT WORK THE HOURS HE CLAIMS.

Labor Code Section 1174 requires an employer to keep records of the hours worked by

each non-exempt employee.  The problem that arises from an employer keeping inadequate records

was resolved by the United States Supreme Court in *Anderson v. Mt. Clemens Pottery Co.* (1945)

328 U.S. 680, 687 - 688:

> When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation, we hold that **an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference**. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference  to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.  (Emphasis added.)

*Anderson v. Mt. Clemens Pottery Co., supra,* was followed by the California Court of

Appeal in *Hernandez v. Mendoza* (1988) 199 Cal. App. 3d 721, 726, which held that "[o]nce an

employee shows that he performed work for which he was not paid, the fact of damage is certain;

the only uncertainty is the amount of damage.  In such a case, it would be a perversion of justice to

deny all relief to the injured person, thereby relieving the wrongdoer from making any restitution for

his wrongful act."

The plaintiff in *Hernandez* was paid a salary for his work as a butcher.  The trial court

found that plaintiff did not sustain his burden of proving the number of hours he worked "with

regard to certainty," despite plaintiff's testimony that he worked 13 hours per day, seven days a

week. *Id. at 724-725.* The Court of Appeal held that an employee need only prove that they worked hours for which they were not compensated. Where an employer fails to keep records required by statute, "imprecise evidence by the employee can provide a sufficient basis for damages." "In concluding the appellant's evidence compelled it to perform guesswork as to the amount of damages, the trial court ignored the legal standard established in *Anderson.* (Citation omitted.) It is the trier or fact's duty to draw whatever reasonable inference it can from the employee's evidence where the employer cannot provide accurate information." *Id.* at 727-728. This duty is set forth in the Judicial Council of California Civil Jury Instruction (CACI) 2703:

> State law requires California employers to keep payroll records showing the hours worked by and wages paid to employees.
>
> If [*name of defendant*] did not keep accurate records of the hours worked by [*name of plaintiff*], then [*name of plaintiff*] may prove the number of overtime hours worked by making a reasonable estimate of those hours.
>
> In determining the amount of overtime hours worked, you may consider [*name of plaintiff*]'s estimate of the number of overtime hours worked and any evidence presented by [*name of defendant*] that [*name of plaintiff*]'s estimate is unreasonable.

The evidence is undisputed that Mr. Topete was scheduled for four ten hour shifts each week, plus a 12 hour shift on Mondays when he came in at 5 a.m. to help do inventory. There were many occasions when he stayed later and several occasions when he came in on his day off. There may have been a few occasions when Mr. Topete left early to pick his children up from school. Given these occasional variations, Mr. Topete estimates that he worked an average of 55 hours per week. Defendant may claim that this estimate is "unreasonable," but there should be no question that he worked at least 52 hours per week, given the hours he was scheduled to work. Either way, defendant has the burden of proving that plaintiff did not work the hours he estimates working.

## C.   PLAINTIFF IS ENTITLED TO ANOTHER YEAR OF BACK WAGES UNDER THE CALIFORNIA UNFAIR COMPETITION LAW.

Plaintiff alleges a cause of action for violation of the Unfair Competition Law under Business and Professions Code Section 17200, et seq. The California Supreme Court specifically held in *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal 4th 163,168, that the Unfair Competition Law is violated whenever an employer fails to pay overtime. This cause of action is

1   subject to a four-year statute of limitations, as opposed to a three year statute of limitations for

2   violation of the Labor Code, enabling plaintiff to recover some of the overtime wages he earned

3   more than three years before filing the complaint.  Although the Unfair Competition Law has no

4   provision for "damages," it does permit an injured party to recover unpaid wages in the form of

5   restitution. *Id.*  at 173.   (Also see: *Janik v. Rudy, Exelrod & Zeiff* (2004) 119 Cal. App. 4th 930,
    942.)

6

7   **D.      PLAINTIFF IS ENTITLED TO LIQUIDATED DAMAGES UNDER
            THE FAIR LABOR STANDARDS ACT.**

8           29 U.S.C. Section 216(b) states that "[a]ny employer who violates the provisions of

9   section 206 or 207 of this title shall be liable to the employee or employees affected in the amount

10  of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in

11  an additional equal amount as liquidated damages."  Despite the statute's use of the word "shall,"

12  29 U.S.C. Section 260 states that the court has discretion to award no liquidated damages where

13  "the employer shows to the satisfaction of the the court that the act or omission giving rise to such

14  action was in good faith <u>and that he had reasonable grounds</u> for believing that his act or omission

15  was not a violation of the Fair Labor Standards Act."  (Emphasis added.)

16          Unlike waiting time penalties under the California Labor Code, "[l]iquidated damages are

17  not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay

18  in receiving wages due caused by the employer's violation of the FLSA."  *Herman v. RSR Security*

19  *Services, LTD, supra.*  "The employer bears the burden of proving good faith and reasonableness,

20  but the burden is a difficult one, with double damages being the norm and single damages being the

21  exception."  *Ibid.*

22          Despite its difficult burden of proof, defendant claimed in its motion for summary

23  judgment that the Court should deny liquidated damages under 29 U.S.C. Section 216(b).  It

24  claimed it acted in "good faith," quoting *Alvarez v. IBP, Inc.,* 339 F. 3d 894, 909 (9th Cir. 2003) as

25  only requiring an employer to prove "subjective good faith" and "objectively reasonable grounds"

26  for believing that the act or omission does not violate the FLSA.  In doing so, defendant deliberately

27  ignored the Court's discussion of and reliance on *Herman v. RSR Security Services, LTD,* 172 F. 3d

28  132, 142 (2nd Cir. 1999) in which it was held that the employer could not prove good faith under the

TOPETE v. RED ROBIN
PLAINTIFF'S TRIAL BRIEF                                                                      Page 21

FLSA because he "had extensive knowledge of the FLSA's requirement, but utterly failed to take the steps necessary to ensure RSR's pay practices complied with the Act." Following this, the Court of Appeals in *Alvarez v. IBP, supra,* found that IBP "failed to take the steps necessary to ensure [its] [ ] practices complied with the [FLSA]." It went even further by finding that "[m]istaking ex post explanation and justification for the necessary affirmative 'steps' to ensure compliance, IBP offers no evidence to show that it actively endeavored to ensure such compliance." *Ibid.*

In *Reich v. Southern New England Telecommunications Corporation,* 121 F. 3d 58, 71 (2nd Cir. 1997) it was unequivocally held that "good faith" under Section 260 "requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." The Court denied defendant's motion for summary judgment with respect to this issue because defendant failed to offer any evidence that it did anything to determine whether its classification of plaintiff as exempt complied with the FLSA. It is extremely unlikely that it will be able to do so at trial, since the three managers named in defendant's witness list testified at their depositions that they had no knowledge of what, if anything, defendant did in order to determine that plaintiff was exempt when he was hired. Accordingly, plaintiff will be entitled to liquidated damages under the FLSA assuming he prevails on this cause of action.[4]

**E.   PLAINTIFF WAS DENIED DUTY FREE MEAL AND REST PERIODS IN VIOLATION OF CALIFORNIA LABOR CODE SECTION 226.7.**

Wage Order 5-2001 requires employers to provide non-exempt employees with uninterrupted duty-free meal and rest breaks. Section 11(A) requires a 30 minute meal period if the work period is more than five hours. It is considered an "on duty" meal period unless the employee "is relieved of all duty." "On duty" meal periods are only allowed "when the nature of the work prevents an employee from being relieved of all duties and there is a written agreement between the parties..." Section 12(A) of the Work Order requires a ten minute rest period for every four hour period of work. Thus, a ten hour shift requires two rest periods. "During required rest periods,

---

[4]This cause of action is subject to a two year statute of limitations pursuant to the Court's ruling on defendant's motion for summary judgment.

1  employers must relieve their employees of all duties and relinquish any control over how employees

2  spend their break time." *Augustus v. ABM Security Services, Inc.* (2017) 2 Cal. 5th 257, 260.

3       The employer's obligation to provide meal and rest breaks was summarized in *Brinker*

4  *Restaurant Corp. v. Superior Court* (2012) 53 Cal. 4th 1004, 1040:

5           An employer's duty with respect to meal breaks under both *section 512, subdivision*
            *(a)* and Wage Order No. 5 is an obligation to provide a meal period to its employees.
6           The employer satisfies this obligation if it relieves its employees of all duty,
            relinquishes control over their activities and permits them a reasonable opportunity to
7           take an uninterrupted 30-minute break, and does not impede or discourage them from
            doing so. What will suffice may vary from industry to industry, and we cannot in the
8           context of this class certification proceeding delineate the full range of approaches
            that in each instance might be sufficient to satisfy the law.
9
10       Plaintiff was never relieved from his duties long enough to take an uninterrupted 30

11  minute meal break.  He was never able to sit down to eat for this long without being interrupted and

12  couldn't leave the restaurant.  Plaintiff was never provided with two uninterrupted ten minute rest

13  breaks during his shifts either.[5]  Any breaks he took were very brief.

14       Red Robin claims that its policies provided all employees with the opportunity to take

15  meal and rest breaks.  However, this policy only applied to its hourly employees.  There was no

16  policy like this for managers.  This is because managers were expected to always be available.  In

17  short, plaintiff was not permitted "a reasonable opportunity to take a 30 minute uninterrupted meal

18  break" as required by *Brinker*.

19       There is no evidence that Red Robin ever informed Mr. Topete or any of its managers that

20  they could take uninterrupted 30 minute meal breaks or ten minute rest breaks.  While neither the

21  Labor Code nor the Wage Order require employers to specifically advise employees of this, Section

22  7(A)(3) requires that employers keep records of when employees take meal breaks.  Without such

23  evidence, plaintiff's testimony about how long or often he was able to take breaks is sufficient to

24  find that defendant failed to make them available.

25       The remedy for failing to permit meal and rest breaks is set forth in Labor Code Section

26  226.7.  It requires one additional hour of pay at the employee's regular rate of compensation for

27       [5]There were one or two occasions when plaintiff left the restaurant in the afternoon to pick his children up from
    school and brought them back to the restaurant.  However, on those days he still wasn't able to take uninterrupted rest breaks
28  in the morning.

each work day he was not provided an uninterrupted duty-free meal and an additional hour of pay for each day he was not provided uninterrupted duty-free rest breaks.

**F.    DEFENDANT PROVIDED INACCURATE WAGE STATEMENTS IN VIOLATION OF LABOR CODE SECTION 226.**

California Labor Code Section 226(a) requires itemized wages statements showing, among other things, the accurate number of hours worked by the employee during each pay period.  The wage statements plaintiff received from defendant failed to comply with this requirement because they stated that the number of hours each pay period was 80, regardless of how many hours he actually worked.  There should be no question that defendant violated this statute.  The remedy under Labor Code Section 226(e) is $50.00 for the first inaccurate wage statement and $100.00 for each inaccurate statement thereafter.  The maximum that can be recovered is $4,000.00.

**G.    PLAINTIFF'S DAMAGES**

Plaintiff is owed a total of $236,653.35 for overtime, liquidated damages, missed meal and rest periods, and civil penalties.  This sum is based on the following calculations:

1.    **Overtime.** Plaintiff's wage statements show that his wages were based on him being paid $32.13 per hour from July 7, 2013 through August 11, 2013; $32.53 per hour from August 12, 2013 through February 8, 2015; and $33.51 per hour from February 9, 2015 through May 10, 2017.  He should therefore have been paid $48.20 for overtime hours during the first time period; $48.70 for overtime hours during the second period; and  $50.27 for overtime hours during the third period.  He worked an average of 15 hours of overtime per week, so he should have been paid an additional $723 each week during the first time period; $730.30 each week during the second time period; and $754.05 each week during the third period.  Plaintiff worked five weeks during the first period; 45.6 weeks during the second time period[6]; and 109.6 weeks during the third time period[7].    The overtime owed for each time period is $3,615, $33,301.68, and $82,643.88

---

[6]According to plaintiff's earning statements he took 12 vacation days between August 12, 2013 and February 8, 2015.  From June 2, 2014 through July 13, 2014 he was on a medical leave because of an on the job injury.  He returned on July 14, 2014, but only worked a "part-time" schedule of six hours per day until December 15, 2014.

[7]Plaintiff took 37 vacation days during this time period.

respectively, for a total of $119,560.56 owed for overtime.

       **B.**      **Liquidated Damages.**  Plaintiff is owed another $66,808.83 for "liquidated damages" under the Fair Labor Standards Act (29 USC Section 216(b)).  This is based on the amount of overtime he is owed for the two years before filing his lawsuit.  (88.6 weeks x $754.05 per week.)

       **C.**      **Missed meal and rest periods.**  Plaintiff was entitled to a 30 minute uninterrupted duty-free meal period and two ten minute uninterrupted duty-free rest periods every day that he worked for Red Robin.  The remedy for this violation is based on his hourly wage for each meal period and rest period missed.  This means that Red Robin owes plaintiff $9,759.00 for the days he worked from July 7, 2014 through February 8, 2015 (5 days/week x 30 weeks x $65.06/day); and $36,726.95 for each day he worked from February 9, 2015 through May 10, 2017 (5 days/week x 109.6 weeks x $67.02).   The total comes to $46,485.96.

       **D.**      **Inaccurate Wage Statements.**  The penalties for inaccurate wage statements are $50.00 for the first violation and $100.00 for each successive violation, with a maximum penalty of $4,000.  The number of applicable pay periods multiplied by the penalty for each pay period exceeds this amount, so the total penalty is $4,000.

## IV.  CONCLUSION

       For the above stated reasons, the Court should find in plaintiff's favor on each of his causes of action and awarded damages in the amount of $236,653.35.  It should also find that he is the prevailing part for the purpose of awarding costs and attorney fees.

ROUSSO & JACKEL

Dated: October 2, 2018          By:   /s/ Jonathan Jackel
                                    JONATHAN JACKEL
                                    Attorneys for Plaintiff